STATE OF CONNECTICUT *v.* ROBERT F. KURZ.

MALTBIE, C. J., BROWN, JENNINGS, DICKENSON and WYNNE, Js.

Argued April 6—decided May 17, 1944.

*Louis Feinmark*, with whom were *John A. Mele* and, on the brief, *Morris Rabinowitz*, for the appellant (defendant).

*Abraham S. Ullman,* state's attorney, with whom, on the brief, was *Arthur T. Gorman,* for the appellee (state).

. JENNINGS, J. The defendant was indicted for the killing of Jessica Garrup. He was convicted of murder in the second degree and has appealed from the judgment, claiming to have been aggrieved by the decision of the court on questions of law arising during the trial in over forty different respects. Each of these assignments has been examined but, if this opinion is to be kept within reasonable limits, some condensation of the discussion is necessary. The orderly arrangement of the briefs of both parties has greatly assisted the analysis of this extensive record.

The state offered evidence to prove and claimed to have proved the following facts: The defendant is a practicing chiropractor and a married man. At the time of the crime charged he was living in his cottage in East Haven with Jessica Garrup, a twenty-eight year old divorcee who was his mistress. She had a five-year-old son by her former marriage and an illegitimate daughter Roberta, born in May, 1942, of whom the defendant was the father. The mother of the defendant also lived there and the entire household consisted of the five persons mentioned. The defendant had had frequent quarrels with the deceased over a considerable period of time, as had his mother. Some of these quarrels were violent. The immediate cause of the quarrels just before the commission of the crime was the insistence on the part of the deceased on going to a nearby inn to drink and dance with other men. About 3 p.m. on Sunday, October 25, 1942, she again expressed a desire to go to the inn for a drink and despite the objections of the defendant went upstairs to put on her coat. The defendant

thereupon picked up a pistol which had a safety grip and safety catch or lock. He had brought the pistol from his office that day or the preceding day. He followed the deceased upstairs and continued the quarrel there. The altercation increased in intensity until the defendant threw her to the floor with such force that her head, striking the wall, caused the wallboard to buckle. As she lay there the defendant fired a fatal shot into her abdomen. The course of the bullet indicated that the shot was fired when the deceased was in the position described.

On the floor above the seventy-eight-year-old mother of the defendant was sewing. Hearing the shot she descended the stairs to hear her son say "I just shot Jessica. Come down and watch me shoot myself." To forestall his suicide the mother took possession of the gun. Proceeding to a neighbor's house to summon aid she immediately disclosed what had happened and showed the gun to the neighbor. Persons nearby who went to the cottage to assist heard the defendant say, "I didn't mean to do it . . . God help me and save me," as he sobbed over the body of the deceased. After the arrival of the police the defendant told contradictory stories about what had happened: First, that the deceased had the gun intending to commit suicide and that she was shot when he tried to take it from her; then, that he was intending to kill himself and that the deceased was shot when she tried to take the gun from him; a little later at the county jail the defendant discussed with an attorney the possibility of a defense of intoxication. His story on the stand was that his mother took the gun from him when he was intending to commit suicide and that the gun was discharged during a struggle between the three of them. This story was not related by him to anyone until his mother had suffered a severe shock

on November 26, 1942. She was not available as a witness because of her death on December 5, 1942. The defendant shot the deceased without legal justification or excuse and of his malice aforethought.

The defendant's claims of proof in so far as they differed from those of the state were as follows: From January 1, 1942, up to October 25, 1942, the feelings of the defendant toward the deceased had been affectionate at all times and this feeling of affection had increased after the birth of Roberta. The relations between his mother and the deceased were pleasant up to May, 1942, when they all went to live together in the cottage. Shortly thereafter antagonism arose between his mother and the deceased which became more marked during the summer and fall of 1942. The defendant remained fond of both of them and became deeply depressed and despondent because of their quarreling. The defendant made no objection to the trips of the deceased to the inn and in fact accompanied her there at times. The defendant did think that the deceased was drinking too much and remonstrated with her on that subject.

The pistol had been brought to the cottage some time during August, 1942, for the protection of the deceased due to the presence of prowlers in the vicinity. On the morning of the Sunday in question the defendant, the deceased and Henry Byrne went to the office of the defendant in New Haven where Byrne was to do some work. All had two or three drinks of whiskey at the office. The defendant and the deceased returned to the cottage and then went to the inn and had a couple of drinks. On returning to the cottage the deceased asked the defendant to put the pistol where her son Billy could not get hold of it. He put it in the holster and went to the bathroom to change his clothes. While there he heard his mother and the

deceased engaged in a wordy quarrel and in attempting to quiet them the deceased was shot under the circumstances described by him on the stand. The contradictory stories told by him about the shooting were based on a desire on his part to keep his mother's connection with the affair away from the police. The physical facts did not indicate that the deceased was lying down when she was shot.

The defendant filed four requests to charge the jury. The general purpose of these requests was to explain to the jury the effect of the claim of the defendant that the deceased was shot by his mother either accidentally or intentionally. The court charged the jury on this point as follows: ". . . the State claims that it has established beyond a reasonable doubt the second proposition essential to murder, namely, that the accused shot Jessica Garrup. The accused, as I have previously stated, does not have to prove his innocence. Nevertheless, he has offered a defense, the core of which is that his mother and not he shot Mrs. Garrup. The mere fact that he may have introduced evidence that some other person may have held the gun at the time it was fired does not take from the State its burden of proving his guilt beyond a reasonable doubt. Even if you should feel that the evidence offered by the accused has not proven that Mrs. Kurz had the gun at the time it was fired, yet you should consider this evidence, and if upon all the evidence in the case you have a reasonable doubt of his guilt, you should of course acquit him. The determination of the guilt of the accused does not rest on any weakness as to his defense; it must rest on the strength of the prosecution." The essential features of the requests were adequately covered by this charge.

Among the assignments of error in the charge as delivered was one directed to the following excerpt: "In

murder in the second degree it is not necessary that wilful, deliberate and premeditated intent to take life exist. That is the characteristic which, if proven, would make the murder one of first degree. In murder in the second degree it is not necessary that there should be an actual intent to kill." The defendant claims that a specific intent to kill is a necessary element in the crime of murder in the second degree. The following definition of murder in the second degree given in the charge was correct. "Murder is unlawful homicide with malice aforethought . . . Therefore, to warrant a conviction of murder in the second degree against this accused the State must establish the three essentials which again I repeat, in order that you may have them in mind: first, that Jessica Garrup is dead; secondly, that she was killed by the accused, and, thirdly, that in killing her he acted of his malice aforethought. If any of these three propositions has not been established, you cannot convict the accused of second degree murder." It will be observed that this definition does not include the necessity of the existence of a specific intent to kill the accused or anyone. That is not necessary. The existence of malice, fully defined in the charge, was sufficient to make the killing murder in the second degree.

"Murder is defined to be where a person of sound memory, and discretion, unlawfully kills any reasonable creature, in being, and in the peace, with malice aforethought, express or implied. It is not necessary that there should be an actual intent to kill." 2 Swift's Digest 267. The author discusses this proposition in greater detail in his "System": "There are instances where there is no intent to kill, yet the act is accompanied by such express hatred, revenge, and cruelty, as to evidence a total depravity of heart, and constitute

malice prepense. Where a park-keeper tied a boy that was stealing wood, to a horse's tail and dragged him along the park: a master corrected a servant with an iron bar; and a school-master stamped on a scholar's belly, so that the sufferers died, these acts were held to be murder. So where a person deliberately goes with a horse used to strike, or discharges a gun among a multitude of people, by which any are killed. Such acts demonstrate that wanton cruelty and unfeeling barbarity, which render the perpetrators unfit and dangerous members of society." 2 Swift's System 300. Our statute is merely declaratory of the common-law crime of murder. *State* v. *Dowd,* 19 Conn. 388, 392; *State* v. *Jacowitz,* 128 Conn. 40, 44, 20 Atl. (2d) 470. See also, *State* v. *Bailey,* 79 Conn. 589, 600, 65 Atl. 951; *State* v. *McGuire,* 84 Conn. 470, 484, 80 Atl. 761; *State* v. *Feltovic,* 110 Conn. 303, 307, 147 Atl. 801; *Commonwealth* v. *Parsons,* 195 Mass. 560, 569, 81 N.E. 291; *People* v. *Hobbs,* 297 Ill. 399, 408, 130 N.E. 779; *State* v. *Gibbons,* 142 Iowa 96, 98, 120 N.W. 474; *State* v. *Rumble,* 81 Kan. 16, 21, 105 Pac. 1; *Wiley* v. *State,* 19 Ariz. 346, 360, 170 Pac. 869; *Gordon* v. *State,* (Miss.) 29 So. 529; *State* v. *Smith,* 33 S.C.L. (2 Strob. L.) 77, 80; 1 Wharton, Criminal Law (12th Ed.), § 440; 29 C.J. 1095, § 69; 26 Am. Jur. 178; notes, 5 A.L.R. 603, 23 A.L.R. 1554, 22 A.L.R. 850. The charge under discussion was correct.

The defendant also claimed that the charge did not cover the possibility that he, as distinguished from his mother, might have shot the deceased by accident. On this point the court charged: "Another illustration of lawful homicide is where one kills another by accident in the performance of a legal act, without malice or intent to kill. Such a homicide is excusable. And right at this point may I not say that if Mrs. Garrup was shot by the accused accidentally, that is, in the

performance of a lawful act, without motive or intent to kill, the killing would be regarded as excusable and you should acquit the accused. The law does not punish those who have killed another accidentally." This and the other assignments directed to the charge are without merit.

Four motions for a mistrial were made and denied. In two instances the claims were inconsequential and any possibility of prejudice to the defendant was removed by the court's careful and correct instructions thereon at the time of the occurrences. In a third instance a witness who had testified to the good feeling existing between the defendant and the deceased, limited to October 25, the day of the killing, was asked the following question on cross-examination: "You had seen Doc knock Jessica to the floor on one occasion, hadn't you?" This question was objected to on the ground that it went outside the scope of the direct testimony. The question was admitted and the testimony went on "A. Yes. Q. And that was along about the 20th of September, 1942, wasn't it? A. I don't know just what date it was. Q. You don't know just what date it was? A. I don't know. Q. You had to intercede in order to get him away from her? A. Yes." The witness, having been offered for the purpose stated, was subject to cross-examination and the question asked might reasonably be considered by the jury to affect his credibility. The plaintiff claimed the admissibility of the question on this ground, as appears elsewhere in the finding.

The last motion was made during the examination of the brother of the defendant concerning a conversation he heard between an attorney and the defendant at the county jail. During the absence of the jury much of this testimony was heard by the court and the state represented that the purpose of the offer

was to show that the defendant intended to adopt drunkenness as a defense and also to show that his accusation of his mother arose around the time when she was taken seriously ill. The court excluded the portion of the conversation objected to but after cross-examination ruled that the defense had opened the door and that the evidence offered during the absence of the jury would now be admitted. The particular answer made the subject of the motion was as follows: "A. Mr. Dunn stated he had information the State was not going to ask a first degree murder charge, but they were after a second, and he said, 'Bob, that will mean that it won't be the chair,' and Bob said, 'Listen, Steve, I either want the chair or want a short term. I absolutely do not want a long term.' " It cannot be said that the court abused its discretion in allowing the answer to stand under the circumstances. Without approving the method of bringing up such matters upon an assignment of error in overruling motions for a mistrial, it is sufficient to point out that a mistrial could not well be granted based on the admission of proper testimony. There was no error in denying the motions for a mistrial.

A large number of rulings on evidence were assigned as error. Two were abandoned. Seven involved statements on direct or cross-examination relevant to the attitude of the defendant to the deceased. He was said to have quarreled with her, remonstrated with her, threatened her and beaten her. The defendant claimed that the incidents were too remote in time to be relevant and, as stated above, were in some cases outside the scope of the direct examination. Such evidence is generally admissible and was particularly relevant in this case where the claim of the defendant was that the relations between him and the deceased were affectionate right up to the time of the killing. *State*

v. *Hoyt,* 46 Conn. 330, 336. There was no error in these rulings.

Four rulings resulted from the exclusion of questions asked of visitors to the mother of the defendant, who had died before the trial, as to statements and conduct by her, claimed by the defendant to support his contention that she had held the gun when the deceased was shot. These questions were asked in the absence of the jury after the defendant had introduced direct evidence that his mother held the gun when the shot was fired. After the arrest of the defendant, his mother went to stay with his brother. When the latter returned from a visit to the defendant at the jail, she asked him whether the defendant was angry with her; when statements bearing upon the crime, in themselves inadmissible, were brought to her attention, her nervousness was indicated by drumming on the table with her fingers; when she was told that the defendant had written a letter practically accusing her of the crime, she made no reply. This evidence was claimed by the defendant as showing conduct indicative of a consciousness of guilt. It is at most equivocal and extremely weak, and the court did not abuse its discretion in excluding the evidence. See *State* v. *Hawley,* 63 Conn. 47, 27 Atl. 417; *State* v. *Yanz,* 74 Conn. 177, 179, 50 Atl. 37; *State* v. *Smith,* 211 N. C. 93, 96, 189 S.E. 175; *Dillard* v. *State,* 298 S.W. 27, 29, 174 Ark. 1179; *State* v. *Russell,* 47 Nev. 263, 269, 220 Pac. 552; *Levison* v. *State,* 54 Ala. 520, 527; *Carlton* v. *People,* 150 Ill. 181, 188, 37 N.E. 244; 1 Wharton, Criminal Evidence (11th Ed.), § 274; 16 C.J. 559, § 1085; 22 C.J.S. 949; 8 R.C.L. 185, § 178.

*State* v. *Hawley,* supra, relied on by the defendant, does not hold to the contrary. The ruling held erroneous in that case consisted of the exclusion of a threat made by a third person before the killing against the

deceased which was a link in the chain of circumstances tending to connect the third person with the crime itself.

A witness, testifying on direct examination for the state, told of hearing the defendant call out to the deceased in an angry voice, as she was leaving the cottage Saturday night, October 24, to come back or she would be sorry. On cross-examination, the defendant attempted to show that the witness had seen the defendant and the deceased together on Sunday, October 25, and that their attitude towards each other was friendly. On objection by the state that this was no part of the direct examination the evidence was excluded. The ruling was inconsistent with those made under similar circumstances against the defendant. The court, however, pointed out that the defendant could call the witness as a part of his case and, in this long trial, lasting over four weeks, this single questionable ruling cannot be regarded as so harmful as to constitute, of itself, reversible error. *State* v. *Hayes*, 127 Conn. 543, 603, 18 Atl. (2d) 895.

It is unnecessary to discuss the remaining assignments of error. They are without merit. In fact, the extensive quotations from this record printed on the appeal show that the court did everything in its power to secure a fair trial for the defendant and succeeded.

There is no error.

In this opinion the other judges concurred.