## STATE OF CONNECTICUT *v.* JERRY K. GLENN
### (10061)

HEALEY, PARSKEY, SHEA, GRILLO and F. HENNESSY, Js.

Argued May 11—decision released September 4, 1984

*J. Robert Nastri, Jr.,* certified legal intern, with whom were *Michael R. Sheldon, Peter B. Hance,* certified legal intern, and, on the brief, *Temmy A. Pieszak,* certified legal intern, for the appellant (defendant).

*John F. Cocheo,* assistant state's attorney, with whom, on the brief, was *C. Robert Satti,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant was convicted after a trial to a jury of the crime of murder in violation of General Statutes § 53a-54a.[1] On appeal, he

---

[1] General Statutes § 53a-54a provides in part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

claims that the trial court erred: (1) in allowing certain comments in the state's rebuttal argument to stand over his objection, and (2) in permitting the state to cross-examine the defendant concerning certain prior thefts and an act of vandalism. We find no error.

It is useful for a fuller understanding of our resolution of the claims of error to set out the following circumstances: The victim, Francis Silva, was beaten to death in his New London apartment sometime during the evening of December 6, 1977, or during the early morning hours of December 7, 1977. On the morning of December 7, 1977, he was found dead in his bed, having apparently been bludgeoned to death by an assailant wielding a golf putter which was later found in plain sight lying partially under his bed.[2] When his body was found, it was also determined that his stereo equipment was missing. Silva was a known homosexual, who had lived with or had sexual relations with black men and frequented homosexual bars seeking sex partners. A search of his apartment disclosed four sets of photos of black males,[3] three of which depicted a sexually-aroused male. It was not until October, 1978, after a reward which had been offered in the case was increased, that information implicating the defendant in the commission of this crime was developed. The

---

[2] At the time of his death, the victim was sixty-one years of age, about six feet one inch tall and weighed approximately 325 pounds.

[3] The first set of three photos depicted a fully dressed black male; the second consisted of six photos of a nude, sexually-aroused black male pictured from the neck down; the third consisted of three photos of a nude, sexually-aroused black male with a Band-Aid on his left hand who was pictured from the neck down; and the fourth was a single photo of a nude, sexually-aroused black male wearing two pairs of white athletic socks also pictured from the neck down. Some of the state's witnesses claimed that the single photo in the fourth set was of the defendant.

There was evidence at the trial that the defendant often wore two pairs of white athletic socks at the same time.

defendant, a black male, at that time was nineteen years of age, five feet nine inches tall and weighed between 132 and 135 pounds.

The defense maintains that the state's case was developed primarily upon information received from four individuals: Otis Guess, Derek Russ, Angelo Hardy and William Bowers. The defendant, while admitting that each of these individuals based his version of the events on one or more separate conversations which each testified he had had with the defendant, asserts that their collective information gave rise to what he characterizes as "three distinct and mutually contradictory theories as to when, how and why the [defendant] had killed Mr. Silva." While it is true that the jury resolved the disputed questions of fact, including credibility, against the defendant, we refer briefly to these three theories of the defendant to focus more usefully upon the claims of error made.[4] The first theory claimed is that the defendant murdered the victim for an unspecified cause or reason which arose out of a homosexual relationship between the victim and himself. As to the second and third theories, which were allegedly predicated upon the defendant and the victim being strangers who had never engaged in a homosexual relationship, the defendant claims that the state maintained that he committed the crime out of anger after the victim had allegedly propositioned him in his car after the victim had picked up the defendant who was hitchhiking. Under the second theory attributed to the state, the defendant had planned and rehearsed the crime in front of a witness (Otis Guess) at least two weeks before its commission. The third theory was that, on the very night of the alleged unsolicited homosexual advance in the victim's car, the defendant, having left the victim's car, later went to the victim's house and killed him.

---

[4] The defendant has not claimed that the evidence was insufficient to support the verdict returned by the jury.

Russ testified regarding a conversation with the defendant in which the defendant admitted that he had killed the victim on the morning of December 7, 1977, after having been picked up while hitchhiking earlier by the victim in his car. Russ testified that the defendant had told him the following: While in the victim's car, the victim made an unsolicited homosexual advance, which so angered the defendant that he demanded to be let out of the car. Upon arriving at his home, the defendant was unable to sleep because of his anger and he went to the victim's apartment and killed him.

Besides admitting the murder to him, Russ also said that the defendant told him that he wore gloves in perpetrating the crime and that he also took the victim's stereo and television. Additionally, Russ testified that he had spoken to the defendant at a New London club in 1978 concerning the rumor that the defendant had committed the Silva murder.[5] When Russ questioned the defendant about this, the defendant asked him from whom he had heard this rumor. Russ maintained that he refused to name his source whereupon the defendant rattled off the names of five or six people whom he, the defendant, said could have been the source.

William R. Bowers testified that on December 6, 1977, between 8:30 p.m. and 9 p.m., he had helped the defendant and Donald Glenn, the defendant's younger brother, unload some stereo equipment from a car into the apartment of Cheryl Glenn, the defendant's sister. Upon inquiry by Bowers and Donald Glenn, the defendant admitted that he may have killed the person from whom he had taken the stereo equipment by hitting him on the head with a golf club. At that time, Bowers said, he observed the defendant to be wearing a leather

---

[5] The defendant's brief states: "At that time [October, 1978], the common rumor, started and spread by the [defendant] was that the [defendant] had committed the murder."

jacket and rubber gloves and to have two speakers with the stereo. He also said that the defendant stated that he had "hit him several times."

Otis Guess testified that the defendant told him of being picked up, while hitchhiking, by a strange man who angered him by propositioning him. He said that the defendant had told him that this angered him and "he was going to kill him, take his stereo, his T.V. and his car." He continued that the defendant "went upstairs, got the golf club and . . . [h]e started showing me how he was going to kill him," saying that he was going to hit him on the head.[6]

Angelo Hardy testified that the defendant admitted the crime to him when, upon leaving a basketball game in New London with the defendant, he observed that the defendant became nervous because of the presence of police at the exit doors. He asked the defendant the reason for that nervousness and the defendant said it was because of the Silva murder as he was the one who committed that crime. The defendant then related some details including that Silva "was a faggot" and that "he beat the guy with the golf club" which he then threw under the victim's bed.

In addition to claiming that these four witnesses were connected to one another by certain ties of friendship, the defendant also claims that Russ, Bowers and two other state's witnesses, Antonio Valero and George Wunnaburger, had all been questioned as suspects in the Silva homicide. Moreover, he claims that Francois Curiel, a former lover of the victim, had ample motive and opportunity to kill Silva. While the defendant himself admitted on direct examination that he had said that he killed the victim and that there were several

---

[6] This conversation, according to Guess, took place in the defendant's house sometime before December 7, 1977.

people there when he did so,[7] he said that he was merely "woofing" or bragging and that he really did not kill Silva.[8]

In order to meet each of the three different theories attributed to the state, the defendant argues that he adduced evidence that supported the two basic themes of his defense. The first claimed theme was that "three of the state's witnesses had themselves been suspected of the killing, and that two of them, along with two other former suspects, were linked together with other state's witnesses by bonds of family, friendship, and a common desire to get the reward money . . . ."[9] The second claimed theme of defense was that the defendant's admission to his friends that he killed Silva "was an idle boast caused by his need to counter his reputation of non-violence and to increase his stature in the eyes of others."[10]

---

[7] The defendant said that this occurred in a New London club in 1978 where he had been drinking beer and smoking marijuana. He named five people who were there when he admitted the killing, including the witnesses Otis Guess and Derek Russ, both of whom testified to that.

[8] An examination of the transcript discloses many issues of credibility that were generated by the evidence for jury resolution. There was evidence other than that of the witnesses Guess, Russ, Hardy and Bowers that tied the defendant to the Silva murder.

[9] The defendant's brief develops this theme only with reference to two of the state's witnesses. The first is Francois Curiel, a former lover of Silva, who he claims had both motive and opportunity to kill Silva. The second is the witness Derek Russ, who admitted he had been questioned as a suspect for threatening a young man with a golf club for an incident that took place nine months after the Silva murder.

[10] In connection with the defendant's second theme, the defendant produced John H. Felber, a psychiatrist, who had conducted examinations of him. As a result of his examinations of the defendant, it was Felber's opinion, inter alia, that the defendant would brag or say that he had done things that he had not done, that he would do this when he was afraid of being inferior or shown to be inferior before another. This expert who opined that this was consistent with the need to "appear big" ties this "need" to the incident of the defendant's bragging to friends in a barroom or tavern that he "was the author of the crime [involved in this case]." Felber also stated that, based on his examination of the defendant, his opinion was that the defendant was not a homosexual.

During final arguments to the jury, the defendant's counsel referred to the testimony of the defendant's expert witness, John H. Felber, a psychiatrist, and said: "He . . . testified that [the defendant] has the kind of a personality — — now we are talking about what psychiatrists do — — but [the defendant] has the kind of personality that would cause him to woof, to say, brag, talk about, in the company of people who he wanted to appear big before, about things he never did. That's all that Dr. Felber testified to." During this argument, the defendant's counsel, in arguing his claim of the defendant's reputation for nonviolence, stated: "Do you remember at any time Mr. Hurley [the assistant state's attorney] introducing any evidence or asking any questions of any witness as to whether Jerry Glenn was ever convicted of an assault of someone? Was he ever arrested for an assault on someone? For a violent crime? You will search your minds, if you had it you would search the record of this case long and hard and find nothing."[11]

In its rebuttal argument, counsel for the state said: "Now Mr. Rose [defendant's counsel], I think, engaged in some unfair argument when he said he [sic] never brought in the fact that Mr. Glenn was ever convicted of an assault. He knows very well that unless somebody is convicted of a felony, that's not admissible, so I can't tell you whether or not he was convicted of an assault unless it was a felony or first or second degree assault. Whether or not he ever committed a third or fourth degree assault, I can't say.

"Mr. Rose: Your Honor, I'm going to object to that, Mr. Hurley has seen the Defendant's record, he knows there is no such conviction, he gave it to me.

---

[11] The record before us does not indicate any objection by the state during the defendant's final argument.

"Mr. Hurley: Well, Your Honor—

"Mr. Rose: You're talking about unfair argument.

"Mr. Hurley: Would you like me to produce the presentence report?

"The Court: Mr. Hurley, proceed with your argument and conclude, please.

"Mr. Hurley: Thank you, Your Honor."

The state thereupon continued its argument passing to another phase of the state's claims in the case without the trial court's giving any explicit instruction to the jury and without defense counsel asking for any such instruction.

The defendant claims error in the trial court's failure to sustain his objection to that portion of the state's argument which, he says, "implied that the jury might consider the possibility that [he] had engaged in and/or been convicted of violent or assaultive acts, despite both the lack of any evidence on the record and the absence in fact of any such convictions was so prejudicial as to deny [him] his right to a fair trial." He also maintains that it was error for the trial court not to take some action to correct this improper argument in which the state implied that the jury could not make what was actually a permissible inference of nonviolence and in which the state argued facts not in evidence and implied that defense counsel had purposefully misled the jury. Because, he continues, he was unable to present further evidence or argument to rebut the implications raised by this argument, three of his most fundamental state and federal constitutional rights were violated: his right to confront and cross-examine adverse witnesses; his right to rebut adverse evidence by presenting the testimony of his own witnesses; and his right

to effective assistance of counsel in the presentation of closing argument from a known record.[12] We do not agree.

Although it is not quite clear that the defendant has properly preserved this claim for our review, we will, nevertheless, address it.[13] " 'A claimed constitutional error, raised for the first time on appeal, will be examined, if at all . . . [to determine if,] when reviewed in the context of the entire trial it violated some right guaranteed to the defendant by the fourteenth amendment to the Constitution of the United States; *Cupp* v. *Naughten,* 414 U.S. 141, 146, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); or article first, § 8 of the constitution of Connecticut.' *State* v. *Kurvin,* 186 Conn. 555, 564–65, 442 A.2d 1327 (1982)." *State* v. *McDermott,* 190 Conn. 20, 24, 458 A.2d 689 (1983); see *State* v. *McCalpine,* 190 Conn. 822, 828, 463 A.2d 545 (1983).

We have said that the fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see *State* v. *Cosgrove,* 186 Conn. 476, 488–89, 442 A.2d 1320 (1982), citing *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

While bad faith by a prosecutor, if present, must be accorded considerable weight in a given case, that is not to say that a showing of good faith on his part is

---

[12] The defendant neither in his brief nor at oral argument has explained how these specific fundamental rights were violated. Because of the specific arguments which he has made concerning his claimed violation of his right to a fair trial, we review the case to determine whether such a violation has occurred.

[13] Although an objection was made, no constitutional claim was made at all to the trial court. Although seven specific exceptions were taken to the charge, none was directed to this claim.

determinative. *State* v. *Binet,* 192 Conn. 618, 629, 473 A.2d 1200 (1984). In this state, the appropriate remedy for an unfair trial due to prosecutorial misconduct is to vacate the judgment of conviction and to grant a new trial. *State* v. *Ubaldi,* supra, 570, and cases there cited. This is the relief which this defendant seeks. Comments in arguments to the jury by counsel will not constitute error unless they are prejudicial and deprive the defendant of a fair trial; *State* v. *Kinsey,* 173 Conn. 344, 348, 377 A.2d 1095 (1977); and they taint the entire proceedings. *State* v. *Hawthorne,* 176 Conn. 367, 372, 407 A.2d 1001 (1978); *State* v. *Hafner,* 168 Conn. 230, 251, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975). Moreover, any challenged comment must be viewed in the context of the entire trial. *State* v. *Haskins,* 188 Conn. 432, 457, 450 A.2d 828 (1982); *State* v. *Kinsey,* supra, 348–49; see *Branch* v. *Estelle,* 631 F.2d 1229, 1233 (5th Cir. 1980).

In a seminal case involving prosecutorial misconduct, the United States Supreme Court said that "[i]t is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935); see *State* v. *Haskins,* supra, 457; ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, the Prosecution Function, § 1.1, Commentary, p. 44 (Approved Draft 1971). Echoing the same view, we have said that "[a] prosecutor must make 'patent fairness and impartiality' the foundation of official conduct . . . and place justice for the guilty as well as the innocent before seeking convictions." *State* v. *Baker,* 182 Conn. 52, 58, 437 A.2d 843 (1980). "While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license

to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone,* 96 Conn. 160, 169, 113 A. 452 (1921); see *State* v. *Kinsey,* supra, 351 (*Loiselle, J.,* concurring), quoting *State* v. *Ferrone* with approval. While it is true that "[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument"; *State* v. *Ubaldi,* supra, 575, quoting *State* v. *Laudano,* 74 Conn. 638, 646, 51 A. 860 (1902); we have also made it clear that "[a] demonstrated deliberate effort by a prosecutor to influence the jury against the defendant through the attempted introduction of obviously inadmissible evidence may entitle the defendant to a new trial. *United States* v. *Woods,* 486 F.2d 172 (8th Cir. [1973]); *State* v. *Hafner,* 168 Conn. 230, 249, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 [1975]." *State* v. *Baker,* supra; see *State* v. *Binet,* supra, 629.

In our examination of this claim, the action of the trial court is entitled to weight because of the vantage point from which it can observe and evaluate the circumstances of the trial. The trial court is in a better position to determine the propriety of the remarks of counsel and whether or not they are harmful. See *State* v. *Ubaldi,* supra, 563; *State* v. *McCall,* 187 Conn. 73, 77, 444 A.2d 896 (1982); *Downing* v. *State,* 178 Ind. App. 144, 152, 381 N.E.2d 554 (1978). In the context of its duty to protect a defendant's constitutional right to a fair trial, "it is the duty of the trial court to prevent situations from arising during the trial which would prejudice the accused in the minds of the jury." *State* v. *Yates,* 174 Conn. 16, 19, 381 A.2d 536 (1977).

The defendant claims in his brief that the state, by delaying its objection to defense counsel's argument

until rebuttal, literally trapped defense counsel into a wholly unnecessary appearance of impropriety. This claim is without merit. Defense counsel at the trial made no such claim,[14] nor are we persuaded that this claim is demonstrated in the context of the whole trial. At this point, the defendant's claim must come down to whether the state's observation "[w]ould you like me to produce the presentence report?" deprived the defendant of a fair trial. We think not. This single observation presented the defendant and the court with a problem of what action, if any, to take. Directed as it was to defense counsel, he had several courses he might have pursued beyond a bare objection. He could have asked the court to excuse the jury preliminary to seeking a curative instruction which could have included a stipulation as to what the presentence report in fact said. He could have moved to strike that portion of the state's argument. He could have sought a mistrial claiming, inter alia, that it was his opinion that the state's argument had suggested that he had misled the jury. None of these things, however, was even suggested to the court by defense counsel. See *State* v. *Smith,* 156 Conn. 378, 386, 242 A.2d 763 (1968). His posture may have been influenced by the fact that while his own arguments about the lack of any evidence introduced by the state of convictions or arrests of the defendant for an assault or violent crime were factually correct, he was still mindful that there was evidence of the defendant's having engaged in fighting and decided not to remind the prosecutor of this evidence so that he might then include it in his closing argument. For example, there was evidence that over the years the defendant and the state's witness, Bowers, were "always fighting." There was also evidence that while

---

[14] Defense counsel on appeal was not defense counsel at trial. Our perusal of the record before us indicates that trial counsel for the defendant provided a vigorous and searching representation for his client throughout this long trial.

in jail awaiting this trial the defendant struck the state's witness Russ on the head for giving a statement to the authorities implicating him in this homicide and threatened him not to be a witness against him.[15] This single remark of the state, taken in isolation, could be construed as prejudicial. Defense counsel, who had pressed his client's cause ably throughout the trial, saw fit to go no further than he did.

We cannot overlook the conduct of the trial court at this juncture. The court was undoubtedly aware that "closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 646–47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). Moreover, the court, which could fairly consider the state's comment about the presentence report to be presumptively but not per se prejudicial, defused a potentially affirmative attack on the defendant by directing the state to continue and conclude its argument. The assistant state's attorney, unlike the prosecutor in either *State* v. *Binet,* supra, or *State* v. *Ubaldi,* supra, immediately heeded that directive and moved on to another phase of his argu-

---

[15] On the state's examination of Russ, after he testified that the defendant "came up behind me and hit me in the head," the following took place:

"Q. Did [the defendant] say anything?

"A. Yes, after he hit me I jumped up and he told me, you know, I asked him why did he hit me, and he said, 'You know why, for signing those statements, a statement against me,' and I told him, 'I don't know what you're talking about.' And he said, 'I know you signed a statement against me, and if anything happens to me, something is going to happen to you.' "

ment. It is evident that the court, in the thick of the fray, recognized that it must comport itself so as to protect the defendant's right to a fair trial. See *State* v. *Yates,* supra. The defendant, however, argues in substance that the trial court "brushed aside" defense counsel's objection and, in doing so, gave "tacit approval" to the state's argument and "may have led the jury to conclude that he [the judge] knew for a fact that the prosecutor was correct in his assertion." This astonishing assertion of the judge's "knowledge" is not documented by any reference to the record. In oral argument before us, the defendant claimed that the trial court just did not see the error which the defendant was claiming. In rejecting this argument, we have already pointed out that the court was not requested by the defendant to undertake any particular course and we need not dwell on the duty of counsel to make evident to the court the nature of his objections at the trial. *State* v. *Ralls,* 167 Conn. 408, 426, 356 A.2d 147 (1974); *State* v. *Bausman,* 162 Conn. 308, 313, 294 A.2d 312 (1972); *State* v. *Smith,* 156 Conn. 378, 385–86, 242 A.2d 763 (1968).

From its vantage point, the trial court could have decided that the just course to follow under the circumstances was the course it took. *State* v. *Falcone,* 191 Conn. 12, 23, 463 A.2d 558 (1983). It had frequently reminded the jury during the trial when adjourning that the jury was to decide the case on the evidence presented before them in the courtroom. When both parties had rested, the court told the jury that "we are through with the testimony" and that "the only remaining parts of the trial now are the arguments of Counsel and the charge of the Court . . . ." During its final instructions, the court instructed the jury that they were the sole judge of the facts, that they could draw "such proper inferences" as they found from facts proven, that any inferences which they draw "should

be logically and reasonably drawn from the facts . . . you find to have been proven" and that the arguments of counsel as to the facts were to be considered but "it is your memory and your recollection of the facts and not Counsel's or mine that will prevail." Toward the conclusion of its charge, it said: "You should consider only the evidence that was admitted by the Court."

The jury, in the absence of a fair indication to the contrary, is presumed to have followed the instructions of the court. *State* v. *Washington,* 182 Conn. 419, 429, 438 A.2d 1144 (1980); *State* v. *Barber,* 173 Conn. 153, 155–57, 376 A.2d 1108 (1977). We are sensitive to the proposition that a verdict must not be inspired by considerations outside the legitimate factual boundaries of the case as presented before the jury under adequate jury instructions. In the context of the entire trial, we cannot conclude that the challenged argument, though prejudicial in isolation, has been demonstrated to rise to the level of denying the defendant's constitutional right to a fair trial.

We now turn to the defendant's second claim of error. Here, the defendant maintains that the court erred in permitting the state to cross-examine him about prior thefts and an act of vandalism which did not pertain to the crime charged. He claims that the trial court's action was an abuse of discretion which amounted to harmful error. We do not agree.

On direct examination, the defendant, after admitting that he had stolen money from the state's witness Hardy as well as a quarter of a pound of marijuana from the state's witness Guess, was asked: "Did you ever steal anything else?" He answered that he stole "a stereo" in 1975 or 1976. Shortly thereafter, he was again asked by his counsel if he "ever stole anything else" and said: "I stole, shoplifting . . . [c]lothes, liquor [coffee liquor], stuff like that." He replied in the affirma-

tive to the question, "[y]ou have been a thief and you have been a liar?" He also testified that he was not lying when he said that he did not kill Silva. On cross-examination, after admitting the 1975 or 1976 stereo theft, he was asked if that was the only time he "ever stole a stereo set or any other stereo equipment," and he answered, "[y]es, sir." The state then asked if he had committed four burglaries in 1973 and defense counsel objected stating that the defendant's record did not contain a burglary. Arguing that the matter had been opened on direct examination and that he had confessed to one theft on direct examination, the state claimed the right to inquire on three more thefts of which it had information.[16] Over the defendant's objection and exception, the court permitted the state to cross-examine on this claim. On cross-examination, the defendant admitted that he "[s]tole speakers, amplifiers and money" from the projects where he lived which he either sold or let somebody else hold. He also said that he damaged a door at Connecticut College in the amount of $145 when he went there to steal the stereo equipment.

We perceive nothing erroneous in the trial court's ruling because the line of inquiry of the defendant on direct examination opened the door to the state's inquiry on cross-examination. *State* v. *Malley,* 167 Conn. 379, 384–85, 355 A.2d 292 (1974); *State* v. *Kurz,* 131 Conn. 54, 63, 37 A.2d 808 (1944); see *State* v. *McLaughlin,* 126 Conn. 257, 262, 263, 10 A.2d 758 (1939); 1 Wigmore, Evidence (3d Ed. 1940) § 15. "When a witness voluntarily testifies, as did the defendant here, he asks the jury to believe him. The jury should be informed about the sort of person asking them to take his word.

---

[16] The appendix to the defendant's brief contains a stipulation with reference to the defendant's prior criminal record. It shows two charges of larceny in the third degree and two charges of larceny in the fourth degree. Jail sentences were imposed in two instances and money fines were imposed in the other two instances.

*State* v. *Wayne Kelley,* [120 N.H. 14, 413 A.2d 300 (1980)]; *State* v. *Cote,* 108 N.H. 290, 296, 235 A.2d 111, 115 (1967), cert. denied, 390 U.S. 1025 [88 S. Ct. 1412, 20 L. Ed. 2d 282] (1968)." *State* v. *Staples,* 120 N.H. 278, 283, 415 A.2d 320 (1980). The doctrine of opening the door cannot, of course, "be 'subverted into a rule for injection of prejudice.' " *United States* v. *Lum,* 466 F. Sup. 328, 335 (D. Del. 1979), quoting *United States* v. *Winston,* 447 F.2d 1236, 1240 (D.C. Cir. 1971). Having undertaken to enhance his credibility before the jury on his direct examination, the state was entitled to flesh out that image on cross-examination within the context of his direct testimony. Not to have been permitted to do so would have subverted the truth-finding process particularly in view of his claim of "woofing" or bragging about things he later claimed never took place. This is particularly true in this case where what did come in through the door, once opened, was proper cross-examination. "In common human experience acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects on a man's honesty and integrity." *Gordon* v. *United States,* 383 F.2d 936, 940 (D.C. Cir. 1967) (Burger, J.); see also, *State* v. *Carter,* 189 Conn. 631, 643, 458 A.2d 379 (1983); *State* v. *Nardini,* 187 Conn. 513, 526, 447 A.2d 396 (1982). The defendant's testimony on direct examination had the purpose of promoting his credibility and the nexus between that testimony and that elicited by the state was such that admitting it was not error.

There is no error.

In this opinion the other judges concurred.