[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This petition for a Writ of Habeas Corpus (#102) was originally filed on April 9, 1997 and thereafter amended on September 20, 2002 (#113). On October 7, 2002, the Respondent, Warden of the State Prison, filed a Motion to Dismiss (#118) on the grounds that this petition, even as amended, constituted the filing of successive habeas petitions and amounted to an abuse of the Writ. On October 29, 2002, there having been no objection by the petitioner, the Court, Fuger, J, granted the Motion to Dismiss (#118) and entered a Judgment of Dismissal (#120). On November 4, 2002, the petitioner filed a Motion to Reargue (#121). At a hearing held before this Court on November 18, 2002, the Judgment of Dismissal (#120) was set aside and the parties were permitted to argue their respective positions in regard to the respondent's Motion to Dismiss (#118). After a full consideration of the arguments by the parties, both in the written briefs and raised at oral argument, this Court granted the respondent's Motion to Dismiss as to Counts One and Two of the petitioner's amended complaint and denied the Motion to Dismiss as Count Three, as articulated in a Memorandum of Decision filed on November 20, 2002.[1] [33 Conn.L.Rptr. 393.]
The matter thereafter came on for trial of the remaining issue on January 9, 2003. The Court received testimony from Attorney Conrad Seifert; the petitioner Donald Utz; and, Professor Todd Fernow, the petitioner's lead Appellate Counsel. As explained in further detail, the petition for a Writ of Habeas Corpus is denied.
Factual and Procedural Background
The petitioner was originally committed to the custody of the Commissioner of Corrections on July 24, 1982 as a result of his arrest. Following a trial before a jury, he was convicted of one count of Murder in violation of C.G.S. § 53a-54a, one count of criminal attempt to commit Murder in violation of C.G.S. §§ 53a-49 53a-54a and one count of carrying a weapon in a motor vehicle in violation of C.G.S. CT Page 1540 § 29-38. On June 14, 1983 the Court, Lavery, J sentenced him to a total effective sentence of sixty (60) years of incarceration. The petitioner commenced serving that sentence immediately and has been in continuous confinement since that date.
The Connecticut Supreme Court decided the petitioner's direct appeal of his conviction on August 19, 1986. Attorney Todd Fernow of the University of Connecticut School of Law represented the petitioner on this appeal. Ultimately, the petitioner's conviction was affirmed. See State v. Utz,201 Conn. 190 (1986). As noted by the Connecticut Supreme Court in its decision, a jury could reasonably have found the following facts regarding the underlying crimes to be true.
 "The defendant and Karen Boyce married in 1975 and the marriage became stormy from almost the early stages. By February 1982, the marriage had deteriorated to the point that Karen left the defendant and moved into the New Fairfield home of her brother, Robert Boyce, and his wife Pamela. She returned to the defendant for about six days but left for the final time when he threatened to kill her if she or her brother tried to contact the police. He made no attempt to contact her for about three months. Between mid-June and mid-July of 1982, the defendant made several telephone calls to Robert Boyce's residence to speak to his wife but was informed by Robert or Pamela that she was "unavailable." The tenor of his calls became such that on July 9, 1982, Robert Boyce filed a complaint against the defendant with the state police. On July 12, 1982, Karen instituted divorce proceedings. About a week later her parents, Dwight and Margaret Boyce, who were also apprehensive, communicated their concerns to the state police. On July 23, 1982, the defendant telephoned Robert Boyce from New York, stating that he wanted to bring his wife's belongings to Robert's home but he was told that he should ship the items and that there was no need for him to come. The defendant did not like that suggestion at all.
 On July 24, 1982, the defendant, who had spent the previous night at the home of friends in New Milford telephoned Robert Boyce's residence in New Fairfield a little after 5 p.m. and asked excitedly: `Please, please, can I come over.' Shortly thereafter, the defendant left New Milford, taking the suitcase he had brought with him the preceding day.
Dwight and Margaret Boyce arrived at Robert's house for a visit about 7:25 p.m. Shortly thereafter, Robert saw the defendant driving up to his house. As the defendant was exiting his car, Robert Boyce told him through a window to leave, that he was not welcome. As the defendant CT Page 1541 approached the house, Robert's wife, Pamela, decided to call the police but was unable to do so because the defendant had disconnected the telephone wires. The defendant, standing on the porch and carrying a large rock, said that he wanted ten minutes with his wife and insisted on seeing her. Dwight refused and Robert told him that this "wouldn't do any good," that the police were on the way to which the defendant responded, "check your phone." The defendant then pulled a gun and from a distance of several feet, aimed the gun first at Dwight. Then, looking `very deliberate, alert, looking straight at [him],' the defendant aimed the gun at Robert saying: `Just move an inch.' Robert dropped to the floor, rolled away from the door and then hurried down a hall to the bedroom to get his gun. While Robert ran back to the bedroom to get his gun, the first of two shots went off in the house. Inside the house, the defendant, about two to three feet from Dwight with his `arm . . . stretched out' and `steady' and with eyes that reminded Margaret `of cold steel,' fired one more shot at Dwight Boyce that lodged between his shoulder blade and chest cavity and which resulted in his death. Having obtained his gun, Robert crouched near the bedroom door and the defendant, from down the hall, fired a shot in Robert's direction.
 After the shooting, the defendant left the house and "very calmly" walked towards his car. He "took his time getting into [the] car," he lit a cigarette and drove away. He returned to New Milford and showed his friends a gun and said that `he shot them. He thought he shot both of them.' He left and soon thereafter he was apprehended by Brookfield police in his car on Route 25. At that time, he was observed operating his motor vehicle in a rather evasive manner to avoid apprehension. He was driving his car without impairment although the arresting officer did testify that in the police car he `smelled a strong odor of . . . an alcoholic beverage' on the defendant's breath. He submitted to the arrest at which time the police frisked him and found the handgun. Tests performed upon a urine sample taken at 11:45 p.m. that night demonstrated that the defendant had a blood alcohol content of .10 percent. An extrapolation from the results of that test later indicated that his blood alcohol level would have been between .16 and .18 percent at the time of the shooting."
See State vs. Utz, 201 Conn. 190, 192-94 (1986).
Since his appeal was decided, the petitioner has filed numerous petitions for a Writ of Habeas Corpus. He filed five of these in the Judicial District of Stamford/Norwalk in 1990. Two of these petitions were withdrawn, Docket Nos. CV90-0107818 and CV90-0107819, while two of the petitions, Docket Nos. CV90-0107817 and CV90-0107821, were CT Page 1542 consolidated and decided by the Court, Karazin, J. on April 9, 1991. These petitions alleged ineffective assistance by the petitioner's trial defense counsel. A third petition under Docket No. CV90-0107820 alleging ineffective assistance of the counsel who represented the petitioner in his motion for a new trial was also decided by the Court, Karazin, J. on the same day, April 9, 1991. All of the petitions were denied.
Shortly thereafter, the petitioner filed two additional petitions for a writ of habeas corpus, this time in the Judicial District of Tolland. The petitioner once again alleged that his trial defense counsel was ineffective. In addition, the petitioner asserted that the counsel who had represented him at the habeas proceedings before judge Karazin were also ineffective. These petitions were consolidated for trial under Docket No. CV911128 and decided by the Court, Bishop, J., on December 4, 1996. These petitions were likewise denied.
The petitioner now seeks a new appeal of his initial conviction in 1983 on the grounds that his appellate defense counsel, Attorney Todd Fernow, did not provide the effective assistance of counsel to which the petitioner was entitled under theSixth Amendment to the United States Constitution. The testimony is clear, and the petitioner has as much conceded through the testimony of the expert witness he presented, Attorney Conrad Seifert, that there was nothing wrong in anything that Attorney Fernow did in pursuing the petitioner's direct appeal. All of the issues that were briefed and raised before the Supreme Court were done so in a professional and effective manner. The petitioner alleges that Attorney Fernow was ineffective in failing to raise before the Supreme Court an issue of prosecutorial misconduct by the Assistant State's Attorney assigned to the case, Attorney Walter Flanagan. In particular, the petitioner felt that certain segments of the state's rebuttal argument were improper and constituted prosecutorial misconduct. No objection to these statements was ever raised at the petitioner's trial, however. This is the sole area of ineffectiveness of appellate counsel that has been raised by the petitioner before this Court.
Attorney Todd Fernow ran the Appellate Law Clinic at the University of Connecticut Law School. The purpose of this clinic was to provide representation to indigent defendants before the State Appellate and Supreme Court and to provide valuable legal training and experience to the University of Connecticut law students involved with the clinic. Professor Fernow was in charge of the team that prepared and argued the petitioner's appeal. The other team members were Ms. Robin Hammeal-Urban, Mr. Michael Sheldon[2] and Ms. Diane Welch, a certified legal intern. CT Page 1543
The first thing that the team did upon undertaking the representation of the petitioner was to obtain the transcript of the petitioner's trial. Thereafter each member of the Appellate team read the transcripts several times and separated issues into possible constitutional and non-constitutional claims. Professor Fernow met with the petitioner several times during the preparation of the brief and included discussion of what issues the petitioner felt should be raised on appeal. The Appellate team did consider and discuss the issue of prosecutorial misconduct among themselves and ultimately decided against including that issue in the appeal. The petitioner was sent a copy of the appellate brief after it had been prepared and filed with the Supreme Court. The petitioner attempted to file a supplemental pro se petition with the Supreme Court in which be raised the issue of prosecutorial misconduct, but the Court rejected it.
The appellate team decided against raising the prosecutorial misconduct issue on direct appeal because the trial defense counsel had not objected to the closing argument by the state's attorney at trial. The team was acutely aware of what was then a recent decision of the state Supreme Court, State v. Glenn, 194 Conn. 483 (1984), in which the Court had rejected a preserved claim of prosecutorial misconduct in circumstances more egregious than that presented in this case. Given that, the team felt that there was little likelihood of success in raising this issue in the petitioner's direct appeal. Instead, the team decided to forego this issue in order that it could be raised in a petition for habeas corpus for ineffective assistance of trial defense counsel. The risk of raising the issue on direct appeal and losing before the Supreme Court would be that the decision would become the law of the case and would adversely affect a potential habeas petition. Consequently, a well-reasoned and intelligent decision was made to not raise the issue on direct appeal. While this reasoning was not conveyed to the petitioner prior to the submission of the brief, it was explained to him at a later time.
Discussion of Law
The petition for a writ of habeas corpus is not a substitute for a direct appeal. "We have repeatedly and emphatically stated that habeas corpus cannot be used as an alternative to a direct appeal. Blue v.Robinson, 173 Conn. 360 (1977); Vena v. Warden, 154 Conn. 363 (1966);Wojculewicz v. Cummings, 143 Conn. 624 (1956)." What this means is that the petitioner cannot, as a sole basis for the granting of the habeas petition, allege that he was convicted as a result of an issue that he could have raised on direct appeal. However, he "may collaterally raise federal constitutional claims in a habeas corpus proceeding even though he has failed to appeal his federal constitutional claims directly . . . CT Page 1544 if he alleges and proves, by a fair preponderance of the evidence, facts which will establish that he did not deliberately bypass the orderly procedure of a direct appeal." Vena v. Warden, 154 Conn. 363 at 366
(1996).[3]
It is clear in the instant case that the petitioner could have raised the issue of prosecutorial misconduct in his direct appeal. It is equally clear that a decision was made by appellate counsel not to raise that issue. Therefore, this Court will not even consider an attack upon the petitioner's conviction on the direct ground that there was prosecutorial misconduct at his trial. Notwithstanding this, however, the petitioner has alleged that he was denied the effective assistance of appellate counsel. Further, the petitioner alleges that the deficiency of performance by his appellate counsel was in not raising the prosecutorial misconduct issue at the direct appeal. This is an issue that can, and indeed must be raised, if at all, through the filing of a habeas petition. "When a petitioner raises a claim of ineffective assistance of appellate counsel because his attorney did not raise an issue on direct appeal, the deliberate bypass standard should be utilized . . . [However] any claim invoking ineffective assistance of appellate counsel automatically satisfies the deliberate bypass requirement." Valeriano v.Bronson, 209 Conn. 75 at 85 (1988).[4]
The standards for effectiveness of counsel set forth in Strickland v.Washington, 466 U.S. 668 (1984) apply with equal force to appellate counsel. In order to prevail in the instant habeas petition, then, the petitioner must prove first that he was denied the effective assistance of appellate counsel in that not only could his appellate counsel have raised the prosecutorial misconduct issue on direct appeal, they should have done so. This will necessarily require a showing that his appellate counsel's performance "was so deficient that it fell below the standard of reasonably effective assistance; and, . . . that these errors deprived the defendant of a fair appeal and caused an unreliable conviction to stand." Valeriano v. Bronson, 209 Conn. 75, at 82 (1988). Then, the petitioner must prove that if the prosecutorial misconduct issue had been raised on direct appeal, there was a reasonable likelihood that he would have prevailed upon that issue on direct appeal.
It is doubtful that the petitioner would have prevailed on the issue of prosecutorial misconduct, even had it been raised in his direct appeal. First of all, the allegations of prosecutorial misconduct extend only to certain statements made by Assistant State's Attorney Flanagan in his rebuttal argument, and as has been previously noted, the petitioner's trial defense counsel did not object to any of these statements at the time. "[N]o objection was made following the remark, suggesting defense CT Page 1545 counsel had not found the statement sufficiently prejudicial to require an immediate curative instruction from the court . . . Moreover, the prosecutor's remark, although improper, was a small part of a very long closing argument." State v. Falcone, 191 Conn. 12 at 23 (1983). This failure to object was a major, although not necessarily fatal, impediment to an appeal. "A defendant must avail himself of the opportunity to make an objection and if he `does not avail himself of the opportunity, he must be holden to a waiver of the objection. Otherwise he would be permitted to lie by and speculate upon the chances of a verdict, and that cannot be tolerated.' State v. Tuller, 34 Conn. 280, 295." State v.Evans, 165 Conn. 61 at 66 (1973). With an unpreserved objection, "[t]here appear then, to exist only two situations that may constitute `exceptional circumstances' such that newly raised claims can and will be considered by this court. The first is . . . where a new constitutional right had arisen between the time of trial and appeal . . . The second `exceptional circumstance' may arise where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." State v. Evans, supra at 70 (1973). Only the latter "exceptional circumstance" could have been used to support an appeal in the petitioner's case.
"In argument before the jury, counsel may comment upon facts properly in evidence and upon reasonable inferences drawn therefrom. United Statesv. Dibrizzi, 393 F.2d 642 (2nd Cir.); State v. Evans, 165 Conn. 61, 71,327 A.2d 576. Comments to the jury will not constitute error unless they are prejudicial and deprive the defendant of a fair trial. Donnelly v.DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431. Moreover, the comments must be viewed in the context of the entire trial. United States v. Phillips, 482 F.2d 191 (8th Cir.), cert. den.,414 U.S. 1114, 94 S.Ct. 846, 38 L.Ed.2d 741." State v. Kinsey,173 Conn. 344, 348 (1977). Attorney Flanagan is alleged to have engaged in prosecutorial misconduct by: (1) mischaracterizing the evidence,[5]
(2) by making disparaging comments about defense witnesses,[6] and (3) making an improper allusion to the case of John Hinckley.[7] It must be noted that in reviewing the issue of prosecutorial misconduct, the Connecticut Supreme Court has accepted "the practice of the majority of jurisdictions in according the absence of bad faith by the prosecutor considerable weight, depending upon the circumstances of the case." Statev. Hafner, 168 Conn. 230, 251 (1975). "While bad faith by a prosecutor, if present, must be accorded considerable weight in a given case, that is not to say that a showing of good faith on his part is determinative."State v. Glenn, 194 Conn. 483, 491-92 (1984). It seems more likely than not that Attorney Flanagan was swept up into the emotion of the moment, the last words to a jury before they go to deliberate, and that this was the genesis of the statements, rather than bad faith. "While the CT Page 1546 privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from facts or to present matters which the jury have no right to consider. State v.Ferrone, 96 Conn. 160, 169 (1921). Nevertheless, in consideration of the isolated nature of the comments, even assuming them to mischaracterize the evidence,[8] in relation to the trial as a whole, it is most unlikely that the Supreme Court would have even entertained the unpreserved claim, much less afforded any relief.
Finally, the instructions by the trial judge would have operated to ameliorate, if not eliminate, any misstatements that may have been made by the prosecutor. "Prosecutorial misconduct generally falls within one of three categories: `those comments whose effects may be removed by appropriate instructions . . . those which are flagrant and therefore deny the accused a fair trial,' (citations omitted) and those `remarks deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant.'" State v. Reid, 193 Conn. 646 at 665 (1984). Mr. Flanagan's comments would fall within the first category. Judge Lavery clearly instructed the jury that "[c]ounsel have highlighted the evidence, or some of the evidence that they considered important. Regardless, it is your recollection of the evidence, not mine or the attorneys, that counts. Whatever the attorneys may have said in their arguments, . . . it is your collective, individual recollection that counts." Exhibit 16, page 69. This proper instruction, therefore, corrected the misstatements, if any, by counsel.
A petitioner must prevail upon both prongs of the Strickland test in order to have a petition granted. "A reviewing court can find against a petitioner on either ground, whichever is easier. Strickland v.Washington, supra, 697; see Nardini v. Manson, 207 Conn. 118, 124,540 A.2d 69 (1988) ('[a] court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if it is easier to dispose of the claim on the ground of insufficient prejudice')." Valeriano v. Bronson, 209 Conn. 75 at 86 (1988).
Trial in this Court of a habeas petition is not an opportunity for a new counsel to attempt to re-litigate a case in a different manner. A habeas court "may not indulge in hindsight to reconstruct the circumstances surrounding the challenged conduct, but must evaluate the acts or omissions from trial counsel's perspective at the time of trial."Beasley v. Commissioner of Corrections, 47 Conn. App. 253 at 264 (1979), cert. den., 243 Conn. 967 (1998). "A fair assessment of an attorney's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances to counsel's CT Page 1547 challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Henry v. Commissioner of Correction, 60 Conn. App. 313
at 317 (2000).
This is particularly true when one is attacking the decision of appellate counsel to not go forward on an issue on appeal. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes,463 U.S. 745 at 751-52 (1983). Simply because there is an appellate issue that could be raised does not necessarily mean that it should be raised. "There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review . . . A brief that raises every colorable issue runs the risk of burying good arguments in a verbal mound of strong and weak contentions." Jones v. Barnes, supra at 752-53. Moreover, it is inappropriate "for judges to second guess reasonable professional judgments and impose on appointed counsel a duty to raise every `colorable' claim suggested by a client." Jones v. Barnes, supra.
Even were this Court to disregard the admonition in Jones and enter the dangerous minefield of substituting its judgment for the judgment of the appellate counsel; there was a good reason for the appellate counsel to not raise the issue of prosecutorial misconduct. The error of the prosecutor, to the extent that it was an error at all, was never the subject of an objection by the trial defense counsel. This failure to preserve the issue would have proven a difficult hurdle to be overcome by appellate counsel in appeal, particularly in light of the decision inState v. Glenn, 194 Conn. 483 (1984), in which the Court had rejected a preserved claim of prosecutorial misconduct in circumstances more egregious than that presented in this case. Moreover, an unfavorable decision on this issue on direct appeal, even if on the basis that it was unpreserved, could have adversely affected the potential habeas petition alleging ineffective assistance of trial defense counsel. Given all of that, this Court simply cannot say that the decision by the appellate counsel to pass over the prosecutorial misconduct issue fell below the standard of reasonable performance.
Appellate Counsel must carefully pick the ground upon which he or she elects to stand and fight. "One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions like the currency depreciate through CT Page 1548 over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one . . . [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one." Justice Jackson, "Advocacy before the United States Supreme Court," 25 Temple L.Q. 115 at 119 (1951).
Since the petitioner is unable to get over the first hurdle of theStrickland standard (namely the failure to show that the performance of his appellate counsel was deficient) his petition will necessarily fail.
This petitioner has been convicted by a jury of his peers and exercised numerous opportunities to attack that conviction. Aside from this habeas petition, he has been afforded a direct appeal to the Connecticut Supreme Court, sought to have his case reviewed by the United States Supreme Court which declined to do so, filed numerous other petitions for habeas corpus challenging his trial defense counsel, the counsel who represented him in seeking a new trial, and his previous habeas counsel. With the denial of this last petition challenging his appellate counsel, the petitioner has clearly exhausted all of his post-trial remedies. Any future habeas petitions pursued by the petitioner must be closely evaluated and scrutinized to determine if he is abusing the right to file the writ. There are no constitutional or due process infirmities with his conviction and sentence.
Accordingly, this petition for a Writ of Habeas Corpus is denied.
S.T. Fuger, Jr., Judge