STATE OF CONNECTICUT *v.* YURI HERNANDEZ
(14168)

PETERS, C. J., BORDEN, BERDON, NORCOTT and SANTANIELLO, Js.

Argued September 30—decision released December 22, 1992

*Robert S. Bello,* with whom was *Christopher R. Bello,* for the appellant (defendant).

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan,* state's attorney, and *Bruce Hudock,* assistant state's attorney, for the appellee (state).

SANTANIELLO, J. The defendant was found guilty by a jury of murder in violation of General Statutes § 53a-54a (a).[1] The trial court rendered a judgment sentencing him to a term of imprisonment of forty years. The defendant appeals claiming that the trial court improperly: (1) limited the cross-examination of the state's primary witness; and (2) allowed the state to cross-examine the defendant concerning prior acts of uncharged misconduct. The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).[2] We affirm.

The jury heard the following evidence that supports its conclusions that the defendant murdered the victim. In February, 1985, the defendant began selling drugs. In 1983, the defendant had made the acquaintance of Roberto Quinones and, in 1986, Quinones

---

[1] General Statutes § 53a-54a (a) provides in pertinent part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 51-199 (b) (3) provides that "an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years" may be taken directly to the Supreme Court.

began selling drugs for the defendant at various night-clubs in Port Chester and White Plains, New York. Throughout 1986 Quinones and the defendant were together daily. They frequently met at the defendant's apartment at 9 Halloween Boulevard, Stamford, to prepare drugs for sale. They roomed together in other locations while they stored drugs in the defendant's apartment, and they went to nightclubs together. Quinones often drove the defendant to these places because the defendant did not have a United States[3] driver's license.

On September 21, 1986, the body of the victim, Sylvia Hunt, a prostitute, was discovered wrapped in a rolled carpet lying near the side of Interstate 95 in Greenwich, near the Mianus River Bridge. The state police were called, secured the area and summoned the state medical examiner. An examination of the body by the medical examiner disclosed that the body was punctured by fifteen stab wounds and that the cause of death was multiple stab wounds to the chest. Blood tests revealed traces of alcohol, cocaine and morphine in Hunt's body.

Subsequent to the discovery of the murder victim, the state police interviewed Quinones as part of their investigation. Quinones informed the police that the defendant had rented an apartment on Halloween Boulevard in Stamford from May to October, 1986. Quinones, who had been to the apartment on numerous occasions, testified that on a Saturday in September, 1986, he visited the defendant at his Halloween Boulevard apartment. The apartment had one entrance in the kitchen-living room area and another in the bedroom. Although Quinones had always used the bedroom entrance when visiting, the defendant told Quinones he could not enter that way and, on that particular day,

---

[3] The defendant did have a driver's license from the Dominican Republic.

he would have to use the kitchen entrance instead. That evening, after preparing drugs, the defendant and Quinones went to La Cascada, a nightclub, where the defendant told Quinones that he had killed a girl with a knife because she had been stealing his drugs and his "necklace chains." The defendant told Quinones that he had gone crazy and "killed her like a dog." He further stated that he had the body at his apartment but had otherwise cleaned up.

The following day Quinones returned to the Halloween Boulevard apartment to prepare more drugs. While in the apartment with the defendant, Quinones observed "a bulk in between the two mattresses" in the defendant's bedroom. The defendant asked Quinones to find the defendant's uncle so that the three of them could dispose of the body. Unable to locate the defendant's uncle, Quinones returned to the apartment, where he saw the living room rug rolled and tied.

About 4 a.m. the next day, Quinones, the defendant and the defendant's uncle drove in the defendant's red Buick automobile to the apartment. Quinones waited while the defendant and his uncle carried the rug down from the apartment and put it in the trunk of the defendant's car. The three men got into the car and the defendant drove to the Mianus River Bridge. Quinones watched as the defendant and his uncle removed the rug from the trunk and threw it behind the barrier alongside the highway. Quinones later identified the rug in which the victim's body was found as the same rug he had seen the defendant remove from the Halloween Boulevard apartment and discard along the highway.[4] Later that same day Quinones returned to the defendant's apartment and saw the defendant cut

---

[4] When questioned by the police, the defendant had stated that he had a light brown rug in his apartment. The defendant also testified at trial that the photos of the rug in which the body was discovered looked like the rug from his apartment.

off bloodstained portions of his mattress, place them in plastic bags, and place the bags in the trunk of his car for disposal.

The following week, the defendant and Quinones were driving by the area where the body had been left, and noticed that the police had discovered the body. In late September or early October, Quinones drove the defendant to the airport, and the defendant told Quinones to give the defendant's car to the defendant's wife, who lived in White Plains.

One of Quinones' neighbors testified that, after the police had found the body, Quinones had told him that the defendant had stabbed a black prostitute to death, had rolled up the body in a rug, and had disposed of the body along the highway. In January, 1988, the police seized portions of the flooring and the doorjambs between the kitchen and bedroom areas from the defendant's apartment on Halloween Boulevard. Laboratory tests revealed the presence of human blood on some of the items.

In the fall of 1988, the police seized a red Buick parked in a garage on Oakwood Avenue in White Plains. The tenants at the address stated that the car had been left there by previous tenants, the defendant's wife and her brother, who had moved out one year earlier. The police found a number of yarn-like fibers in the trunk of the Buick. Laboratory tests revealed that these fibers were consistent with those taken from the rug in which the victim's body was found. The police also found a key chain bearing the initial "S" in the trunk of the Buick.

The police testified that the defendant had told them that he thought the key chain looked like one the defendant's wife had given him.[5] The police also testi-

---

[5] The defendant testified that he had identified a picture of a key chain shown him by the police as his own but did not recollect ever seeing the

fied that the defendant had told them that he had always kept a knife in the red Buick. He described the knife as a machete.

I

The defendant's first claim is that the trial court abused its discretion and prejudiced his defense by refusing to allow him to cross-examine Quinones, the state's primary witness, concerning uncharged misconduct that had occurred ten months after the murder.[6] At trial, Quinones testified that the defendant had told Quinones that he had killed Hunt. The defendant attempted to establish that Quinones had killed the victim.[7] The

key chain shown him in court. The police testified, however, that the key chain in the photo and the key chain shown to the defendant at trial were the same.

[6] The defendant claims that by limiting his cross-examination of Quinones, the state's primary witness, the trial court violated the defendant's constitutional right to present a defense. " 'Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error.' *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985). Only last year, the United States Supreme Court specifically reiterated that ' "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to what extent the defense might wish." *Delaware* v. *Fensterer*, 474 U.S. 15, 20 [106 S. Ct. 292, 88 L. Ed. 2d 15 (1985)] (per curiam) (emphasis in original).' *Delaware* v. *Van Arsdall*, [475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)]." *State* v. *Jones*, 205 Conn. 638, 670, 534 A.2d 1199 (1987).

"[R]estrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . ." (Internal quotation marks omitted.) Id. We find that the trial court permitted cross-examination sufficient to satisfy the defendant's constitutional right to present a defense. This claim, therefore, is without merit.

[7] The defendant did present evidence demonstrating that he and Quinones had equal access to the murder scene and that Quinones may have had a motive to implicate the defendant in the murder. The defendant was allowed to present evidence suggesting that: Quinones had access to the apartment at Halloween Boulevard where the murder was thought to have occurred; Quinones had access to the defendant's car that was used to transport the body; Quinones frequented prostitutes and was jealous of the defendant's many relationships with women; and Quinones resented the fact that the defendant often referred to Quinones as his chauffeur.

defendant attempted to bolster this theory by introducing into evidence the fact that, in July, 1987, Quinones had threatened to slash a former girlfriend and to kill her, her husband and other members of her family. After hearing argument outside the presence of the jury, the trial court excluded this evidence because it was too remote in time and not factually similar to the murder.

Our case law recognizes the right of a defendant to introduce evidence that indicates that another person, not the defendant, committed the crime with which the defendant is charged. See, e.g., *State* v. *Echols,* 203 Conn. 385, 392, 524 A.2d 1143 (1987); *State* v. *Burge,* 195 Conn. 232, 252, 487 A.2d 532 (1985); *Siemon* v. *Stoughton,* 184 Conn. 547, 555–56, 440 A.2d 210 (1981); *State* v. *Giguere,* 184 Conn. 400, 405, 439 A.2d 1040 (1981); *State* v. *Marshall,* 166 Conn. 593, 601, 353 A.2d 756 (1974). The defendant must, however, present evidence that directly connects a third party to the crime with which the defendant has been charged. *State* v. *Echols,* supra; *Siemon* v. *Stoughton,* supra; *State* v. *Giguere,* supra. "It is not enough to show that another had the motive to commit the crime; *State* v. *Marshall,* supra; *State* v. *Perelli,* 125 Conn. 321, 328, 5 A.2d 705 (1939); nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. *Brown* v. *State,* 275 Ind. 227, 231, 416 N.E.2d 828 (1981)." *State* v. *Echols,* supra.

The rules of relevancy govern both the initial presentation of third party culpability evidence, and the admissibility of particular evidence in that regard. See *State* v. *Echols,* supra, 393; *State* v. *Burge,* supra; *State* v. *Giguere,* supra, 405–406; *State* v. *Marshall,* supra, 601–602. Whether third party culpability evidence is direct enough to be admissible is ultimately a matter of the discretion of the trial court. *State* v. *Echols,* supra.

"We test the question of remoteness by this rule: 'Generally speaking, the question of remoteness, as justifying the exclusion of evidence, must depend upon all the considerations, including time, the character of the evidence, and all the surrounding circumstances which in the opinion of the court ought to have a bearing upon its worthiness to be brought into the consideration and determination of the matter in contention.' *State* v. *Kelly,* 77 Conn. 266, 269, 58 Atl. 705 [1904]." *Bishop* v. *Copp,* 96 Conn. 571, 580, 114 A. 682 (1921). The evidence in question here related to conduct that occurred ten months after the murder that arose under very different circumstances and the threat was made to different individuals. Furthermore, there is no connection between Quinones' former girlfriend and the murder victim. Compare *State* v. *Burge,* supra, 252 (third party had confessed to recent commission of similar assault); *State* v. *Ross,* 18 Conn. App. 423, 424, 429, 558 A.2d 1015 (1989) (third party had been involved in similar fight one week earlier and had argument with victim moments before shooting). Under the circumstances, the trial court did not abuse its discretion in concluding that this evidence was not relevant because it was too remote in time.

Furthermore, the trial court found this evidence factually dissimilar to the circumstances surrounding the murder. The defendant agreed with the trial court's determination that this case does not involve a signature crime.[8] Additionally, the trial court properly excluded this evidence because it did not directly connect Quinones to the murder. We conclude that the trial court's ruling was not an abuse of discretion.

## II

The defendant's second claim is that the trial court improperly permitted the state, in cross-examining the

---

[8] Defense counsel at trial stated, "we're not talking about a signature crime."

defendant, to go beyond the scope of the direct examination of the defendant. The challenged cross-examination concerned the defendant's purported violence toward women. At trial the defendant testified on direct examination that he had many relationships.[9] He portrayed himself as a popular, churchgoing man who had romantic relationships with many women.[10]

[9] "Q. Now did [the police] ask you about your experiences with prostitutes?
"A. Yes.
"Q. And what did you tell them?
"A. That I did not use prostitutes. I had a lot of girls.
"Q. Okay. And you did talk about a white prostitute?
"A. Yes.
"Q. And what did you tell them about her?
"A. I told them that she was a white girl from Port Chester and that I brought her to my apartment.

\* \* \*

"Q. Now Mr. Hernandez, you mentioned staying in Bridgeport and New Haven on occasion. Who would you stay with there?
"A. With women that I would date, I would stay at their homes.
"Q. And would you also at the other places you mentioned, stay with women?
"A. What was that?
"Q. The other places that had been mentioned, the hotels in Stamford, your apartment in Stamford, would you also stay with women there on occasion?
"A. Yes."

[10] "Q. Now, where would you meet your girlfriends?
"A. Could have been at the jobs I used to work, at the Galleria, at McDonald's, at the beach, anyplace.
"Q. Did you ever meet any women at church?
"A. Also at the church.
"Q. And when did you go to church?
"A. On Sundays.

\* \* \*

"Q. Where would you socialize with these women?
"A. What do you mean? We would get together at La Cascada or Mokondo in Port Chester.
"Q. And what evenings did you go to La Cascada?
"A. Friday, Saturday and Sunday.
"Q. And did you do this every weekend?
"A. Yes.
"Q. And most evenings when you left La Cascada, did you leave with a date?

Although some women were jealous of his popularity, their jealousy was expressed in harmless ways.[11] The defendant also portrayed himself as a peaceful man; he claimed often to have stopped fights Quinones would get into and he claimed not to have fought with Quinones even when he was angry with him.[12] On cross-examination, the defendant testified that he believed his relationships with women were good but that some women would fight with him. When the state tried to question the defendant about his relationship with a specifically identified woman, the defendant objected.[13]

"A. Every time I went to La Cascada, I always had women, because I would, the day before, make an agreement to get together there.

* * *

"Q. Now, I may be repeating myself, but when you spent the night with a woman, where would this be?

"A. Hotels, at their homes, or in my apartment.

* * *

"Q. Did you personally do any loud partying in that apartment? . . .

"A. No.

"Q. Did you ever play music?

"A. Romantic music, but very low."

[11] "Q. Did a lot of your girlfriends get mad at you because you were going out with so many different—

"A. Yes.

"Q. And how do you know that?

"A. Sometimes they would just give me a flat tire on my car, or they would write names on my car."

[12] "Q. And what would you do when [Quinones] got into fights?

"A. I would have to interfere. . . .

"Q. Okay. Now did you argue with Robert [Quinones] over his drug and alcohol use?

"A. Yes.

"Q. And how often?

"A. Almost daily.

"Q. And did you ever come to blows on this issue?

"A. No, never."

[13] Before the trial had begun, on May 22, 1989, the defendant had filed a "Motion to Suppress Statements." On June 14, 1990, the court denied this motion because it could not determine the prejudicial effect of the defendant's statements at that time. In June, 1990, the defendant filed a "Motion in Limine Re: Uncharged Misconduct" to exclude evidence of the alleged sexual assault or alleged attempted sexual assault of a specifically

With the jury excused, the court heard argument on the prejudicial effect of the anticipated testimony concerning an alleged attempted sexual assault accompanied by physical violence. The state claimed that the defendant had portrayed himself as having good relationships with women and that the state, therefore, was entitled to pursue the matter further.[14] The court held that the alleged sexual assault was not relevant to a murder by stabbing and the prejudicial effect of the testimony on this topic outweighed its probative value. The court held, however, that testimony regarding alleged physical violence against the woman was admissible. The defendant had opened the door to this testimony when he created an impression of himself as a peaceful man with good relationships with women.

"Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject." *State* v. *Graham,* 200 Conn. 9, 13, 509 A.2d 493 (1986); see also *State* v. *Roy,* 173 Conn. 35, 50, 376 A.2d 391 (1977). "The party who initiates discussion on the issue is said to have 'opened the door' to rebuttal by the opposing party." *State* v. *Graham,* supra. " 'The doctrine of opening the door cannot, of course, "be 'subverted into a rule for injection of prejudice.' " *United States* v. *Lum,* [466 F. Sup. 328, 335 (D. Del. 1979)], quoting *United States* v. *Winston,* [447 F.2d 1236, 1240 (D.C. Cir. 1971)].' *State* v. *Glenn,* [194

identified woman by the defendant. The court heard argument on this motion on August 3, 1990, before the trial commenced. At that time the court did not act on the motion because the state had represented to the defendant that it had not intended to introduce any evidence of striking, sexual assault, or attempted sexual assault in its case-in-chief.

[14] "This Defendant has made statements on direct and cross regarding his relationships with women. And so far, it's all pretty much hunky dory . . . . I mean it appeared at the time of the State's case that this might be an extraneous issue. The Defendant has seen fit to place it in the for (sic) . . . ."

Conn. 483, 499, 481 A.2d 741 (1984)]. The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it ' "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *California Ins. Co.* v. *Allen,* 235 F.2d 178, 180 (5th Cir. 1956).' *United States* v. *Winston,* supra. Thus, in making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal. Id., 1241–42; *People* v. *Arends,* 155 Cal. App. 2d 496, 509, 318 P.2d 532 (1957)." *State* v. *Graham,* supra, 13–14.

" 'When a witness voluntarily testifies, as did the defendant here, he asks the jury to believe him. The jury should be informed about the sort of person asking them to take his word.' *State* v. *Staples,* 120 N.H. 278, 283, 415 A.2d 320 (1980), quoted in *State* v. *Glenn,* [supra, 498–99]." *State* v. *Williamson,* 206 Conn. 685, 699, 539 A.2d 561 (1988). " 'Matters which might not be strictly relevant on direct examination may be so on cross-examination where that matter is explored for the purpose of credibility. Given that function of cross-examination in shedding light on the credibility of the witness' direct testimony, "[t]he test of relevancy is not whether the answer sought will elucidate any of the main issues, but whether it will to a useful extent aid the court or jury in appraising the credibility of the witness and assessing the probative value of the direct testimony." ' " *State* v. *Williamson,* supra, quoting *State* v. *Ouellette,* 190 Conn. 84, 102, 459 A.2d 1005 (1983). A question is within the scope of the direct examination if it is intended to "rebut, impeach, modify or explain any of the defendant's direct testimony . . . ." *State* v. *Zdanis,* 173 Conn. 189, 196, 377 A.2d 275 (1977).

The court has wide discretion to determine the scope of cross-examination. *State* v. *Jackson,* 198 Conn. 314, 319, 502 A.2d 865 (1986); *State* v. *Sharpe,* 195 Conn. 651, 657, 491 A.2d 345 (1985); *State* v. *Thompson,* 191 Conn. 146, 148, 463 A.2d 611 (1983); *Akers* v. *Singer,* 158 Conn. 29, 36, 255 A.2d 858 (1969); *State* v. *Kurz,* 131 Conn. 54, 37 A.2d 808 (1944). " 'Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion.' " *State* v. *Jackson,* supra, quoting *State* v. *Briggs,* 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). " 'Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done.' " *State* v. *Williamson,* supra, 698, quoting *State* v. *Howard,* 187 Conn. 681, 685, 447 A.2d 1167 (1982); see also *State* v. *Braman,* 191 Conn. 670, 676, 469 A.2d 760 (1983). "Our review is limited to whether the trial court's rulings exceeded the latitude accorded its discretion in such matters." *State* v. *Williamson,* supra, 698–99.

With the jury excused, the trial court considered arguments by the parties about the proposed questioning concerning the defendant's alleged misconduct with respect to the woman. The court agreed with the state that by portraying himself in a certain manner on direct examination, the defendant had opened the door to questions that would elicit testimony contradicting this portrayal of the defendant to enable the jury better to assess the defendant's credibility. On weighing the probative value and prejudicial effect of this proposed testimony, however, the court determined that testimony concerning violence toward the woman would be allowed but testimony concerning an alleged sexual assault would not. Subsequently, while being ques-

tioned on cross-examination about his role as a peace-maker at the nightclub, the defendant admitted that he had had arguments with women and had slapped them around.[15] Although the defendant did not state on direct examination that he was never violent toward women, the record supports an inference that his relationships were nonviolent. The trial court did not abuse its discretion when it allowed the state to cross-examine the defendant to modify this inference.

The judgment is affirmed.

In this opinion PETERS, C. J., BERDON and NORCOTT, Js., concurred.

BORDEN, J., concurring. I agree with part I of the majority opinion.

Regarding part II, however, I believe that the challenged evidence addressed on the cross-examination of the defendant was not fairly within the scope of the defendant's direct examination. There was no evidence in that examination, directly or by inference, that he was nonviolent in his relationships with women. Thus, the trial court abused its discretion in admitting the cross-examination that he had violently sexually assaulted the specifically identified woman.

I am not persuaded, however, that it is more probable than not that the improperly admitted evidence

---

[15] "Q. Okay. Now you've indicated that you—you're something of a peace-maker at La Cascada, weren't you?

"A. When there would be fights involving people that I knew, I would try to separate them.

"Q. So you were always the peacemaker?

"A. Not all the time . . .

"A. That I am aware of, I never had any problems involving fights, arguments with women and such.

"Q. You just fought with women?

"A. Arguments with women.

"Q. So you didn't punch anybody except [the woman]; is that right?

"A. I have had many women and I have slapped them around."

affected the jury's verdict. First, the defendant, on redirect, vitiated the effect of the court's ruling by volunteering that he had "had many women and . . . slapped them around." Second, the other evidence against the defendant was quite strong. Third, there is no indication that the state heavily traded on this evidence in final argument to meet its burden of proof. I would, therefore, hold that the trial court's ruling was harmless error, and I concur in the judgment.