### STATE OF CONNECTICUT v. ROBERT COOPER
### (14223)

Peters, C. J., Callahan, Borden, Berdon and Norcott, Js.

Argued January 8—decision released August 24, 1993

*Suzanne Rathbun,* certified legal intern, with whom were *Timothy H. Everett, Jillian F. Zacks,* certified legal intern, and, on the brief, *Kathleen M. Paul,* certified legal intern, for the appellant (defendant).

*Mary H. Lesser,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *John Massameno,* senior assistant state's attorney, for the appellee (state).

CALLAHAN, J. This appeal concerns several issues arising from the trial of the defendant, Robert Cooper. The defendant was charged in a substitute information and convicted, after a jury trial, of the crime of murder in violation of General Statutes § 53a-54a,[1] in connection with the March 30, 1988 homicide of the victim, Dwight Barnes, in the Charter Oak Terrace area in Hartford. The defendant was sentenced by the trial court to a term of imprisonment of thirty years. He appeals directly to this court pursuant to General Statutes § 51-199 (b) (3).[2]

On appeal, the defendant claims that the trial court improperly: (1) allowed the state to introduce evidence of his possession of marijuana on a date some two months prior to the homicide; (2) permitted irrelevant prejudicial testimony during the state's cross-examination of his girlfriend, Harriet Thompson; (3) allowed the state to impeach a defense witness with

---

[1] General Statutes § 53a-54a provides in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

a 1964 felony conviction; (4) allowed the state to comment, in final argument, regarding the defendant's failure to make a written statement; and (5) instructed the jury concerning specific intent. We reject each of these claims.

The transcript of the defendant's trial reveals the following. Midday on March 30, 1988, the victim, Leonard Gaston, Kendell Jones, Jarez Sanders and others were gathered near a dumpster in a parking lot in a known drug dealing area called "the block" located off Delta Street in the Charter Oak Terrace area in Hartford. At that time, some of those gathered discussed the possibility of robbing the defendant, who was not from the neighborhood, but who was there going from car to car asking the occupants if they wished to purchase drugs.

Gaston, who was acquainted with the defendant, confronted him and asked why he was in the neighborhood. The defendant replied that he was selling drugs for a person named "Pinochle." Gaston asked him to leave the area but the defendant refused. The victim then approached the defendant and offered to purchase two bags of marijuana. In return for the two bags of marijuana, the victim paid the defendant $10. The victim then asked the defendant if he had any cocaine. The defendant responded by handing the victim a plastic bag containing a substance that resembled cocaine. The victim, however, did not appear to deliver any money to the defendant in return for the bag.

The victim and the defendant then argued about the defendant selling drugs in "the block." As the victim turned and appeared to be walking away from the argument, the defendant grabbed him by the arm and the two men engaged in a scuffle. Jones and Sanders intervened to assist the victim, who had an injured leg and a cast on his right arm. The victim, while struggling with the defendant, shouted that the defendant had a

gun, whereupon Jones and Sanders fled and hid behind a nearby dumpster. Gaston then ran to where the two men were fighting and attempted to wrest the gun from the defendant. The defendant, however, broke free, and, according to Jones, Sanders and Gaston, approached the victim, deliberately pointed the gun at his head and shot him. The defendant then ran toward the Park River where he was subsequently apprehended by the police. The next day, the police recovered from the river the gun that had been used to shoot the victim. There were two spent shells in the cylinder.

At trial, Officer Daniel Zak of the Hartford police department testified that he and his partner had responded to the scene of the shooting. Zak testified that he had pursued and apprehended the defendant, who had fled toward the river carrying a long barreled revolver. Moments after Zak had apprehended the defendant, Officer Jose Sanchez arrived and assisted in the defendant's capture and handcuffed him. Both officers testified that the defendant had no revolver on his person when he was apprehended.

At the Hartford police station, Officer Nicholas Russo and another Hartford police officer interviewed the defendant after reading him *Miranda* warnings.[3] The defendant told Russo that he had been attacked by a group of seven to nine black males who had beaten him to the ground. Russo testified that the defendant had told him that while he was being beaten he had noticed a gun on the ground, had picked it up, and, as he was attempting to get to his feet, the gun had accidentally discharged and the bullet had struck one of his assailants. He also said that the gun had discharged again while he was running from the scene and that he had thrown the gun in between two houses. Neither San-

---

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

chez nor Russo saw any cuts, bruises or swelling on the defendant when he had been apprehended or when he had been interviewed.

Three eyewitnesses to the shooting, Gaston, Sanders and Jones, testified at the defendant's trial. Gaston and Jones both testified that the defendant had not been knocked to the ground during the altercation. All three testified that the defendant had deliberately aimed the gun at the victim's head and shot him. Gaston and Sanders also stated that they had previously seen a man whom they knew only as "Pinochle" with the same gun that the defendant had used to shoot the victim. Pinochle was the brother of the defendant's girlfriend and the person for whom the defendant said he had been selling drugs at the time of the homicide.

Although the defendant did not testify at his trial, he called several witnesses on his behalf. A resident of the Charter Oak Terrace area, Eddie Bowman, testified that he had seen the defendant on the ground during the fight but that he had not seen a gun, nor had he witnessed the shooting. He also testified that he had previously seen Pinochle with a long barreled .22 caliber revolver but that Pinochle had sold the gun. Another defense witness, Raymond Vail, testified that he had observed the fight and had seen the defendant beaten to the ground. He also said that he had not seen a gun and that, although he had heard a shot, he had not seen the shooting. Vail admitted that he had waited two years to come forward with his account of the incident.

I

The defendant initially claims that he is entitled to a new trial because the trial court improperly permitted the state to introduce evidence, over his objection, of his arrest for possession of marijuana at a time two months prior to the date of the shooting. He argues

that his previous possession of marijuana was irrelevant to the crime charged because it did not provide a motive for the shooting of the victim and was not indicative of drug dealing or the likelihood of his having possessed a weapon on the date of the incident, the ostensible reasons for which it had been admitted.

At trial, the state sought to present testimony that on a previous occasion the defendant had been apprehended by the police while in possession of $83 in currency and ten plastic bags containing marijuana. The trial court, after hearing arguments concerning the defendant's objection to the admissibility of the proffered testimony, allowed it into evidence.

Hartford police officer Christopher Lyons then testified that on January 28, 1988, he had arrested the defendant for the possession of ten bags containing marijuana. Lyons stated that in January, 1988, he had been investigating citizen complaints of marijuana sales and had observed a car being driven by a recognized drug dealer known to have been operating with a suspended operator's license. Lyons testified that he had arrested the operator of the automobile and also the defendant, who was a passenger in the dealer's automobile. The defendant had been arrested because he had in his possession ten plastic bags containing marijuana.

Immediately following Lyons' testimony, the trial court delivered a lengthy admonition to the jury informing it that Lyons' testimony had not been admitted to show that the defendant's character was bad or that he had criminal propensities and that it was not to be used for those purposes. The court informed the jury that the testimony was to be used only for the purposes for which it had been admitted, that is, as some evidence relevant to the defendant's motive in shooting the victim, as some evidence that the incident might

have been drug related and as some evidence of the likelihood of the defendant's having been armed.[4]

The state's position was that Lyons' testimony was relevant for the purposes for which it had been admitted because it corroborated other evidence that the reason for the shooting had been the victim's interference with the defendant's drug selling activity and because it refuted the defendant's statement that the shooting was accidental. The state also claimed that the evidence was not unduly prejudicial because there was other evidence that the defendant had been engaged in the sale of drugs on the day of the shooting.

As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. *State* v. *Crumpton,* 202 Conn. 224, 228, 520 A.2d 226 (1987); *State* v. *Geyer,* 194 Conn. 1, 5, 480 A.2d 489 (1984). We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. *State* v. *Mooney,* 218 Conn. 85, 126, 588 A.2d 145, cert. denied,     U.S.     , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); *State* v. *Brown,* 199 Conn. 47, 56, 505 A.2d 1225 (1986); *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982). "[Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. *United States* v. *Everett,* 825 F.2d 658, 660 (2d Cir. 1987), cert. denied, 484 U.S. 1069, 108 S. Ct. 1035, 98 L. Ed. 2d 999 (1988) . . . ." *State* v. *Santiago,* 224 Conn. 325, 338, 618 A.2d 32 (1992); *State* v. *Duntz,* 223 Conn. 207, 240, 613 A.2d 224 (1992). Moreover, we have held that such evidence may be used to " 'complete the story of the crime on trial by placing it in the context of nearby

---

[4] Lieutenant Timothy Hogan of the Hartford police department testified as an expert witness that there are defined drug territories in the city of Hartford and that it is likely that a person attempting to sell drugs outside his own territory would carry a weapon for protection.

and nearly contemporaneous happenings.' " *State* v. *Brown,* supra, 56, quoting C. McCormick, Evidence (3d Ed. 1984) § 190; C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.

To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. *State* v. *Brown,* supra, 56. "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." *State* v. *Braman,* 191 Conn. 670, 676, 469 A.2d 760 (1983); *State* v. *Shindell,* 195 Conn. 128, 134, 486 A.2d 637 (1985).

The defendant contends that his prior arrest for possession of marijuana was not relevant to prove his subsequent drug involvement, a motive for the shooting of the victim, or the likelihood of his having been armed. He argues that Lyons' testimony was indicative only of a propensity toward criminal behavior, was unduly prejudicial and was not admissible under any exception to the general rule prohibiting such evidence. We disagree.

The trial court could reasonably have concluded that the evidence of the defendant's prior misconduct served to corroborate other testimony in the state's case that indicated that the defendant sold drugs and that the victim was shot because he had interfered with the defendant's drug related activity. The court also could reasonably have determined that, because of the circumstances surrounding the defendant's prior possession of ten bags of marijuana, the defendant was not a novice to the drug trade and might possess the predilection of those selling drugs outside familiar territory to carry weapons to protect themselves and their

merchandise. The defendant conceded at oral argument in this court that a drug dealer doing business in a strange neighborhood might have a motive to be prepared to take drastic action if someone interfered with him.[5]

Although it is a close call, we cannot say that the trial court abused its broad discretion when it concluded that the evidence of the defendant's prior marijuana possession had some probative value in establishing that the shooting on March 30, 1988, was drug related.[6] See *State* v. *Miller,* 202 Conn. 463, 482, 522 A.2d 249 (1987); *State* v. *Parker,* 197 Conn. 595, 601, 500 A.2d 551 (1985). "Evidence is not inadmissible because it is not conclusive; it is admissible if it has a tendency to support a fact relevant to the issues if only in a slight degree. *State* v. *Morrill,* 197 Conn. 507, 548, 498 A.2d 76 (1985)." *State* v. *Miller,* supra.

The next issue to be determined is whether the trial court abused its discretion by admitting the prior misconduct evidence because it was more prejudicial than probative. See *State* v. *Ibraimov,* supra, 352. The standard for review is clear. " 'The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court.' *State* v. *Howard,* 187 Conn. 681, 684, 447 A.2d 1167 (1982); see also *State* v. *Tucker,* 181 Conn. 406, 416, 435 A.2d 986 (1980); *State* v. *McCarthy,* 179 Conn. 1, 22, 425 A.2d 924 (1979); *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980)." *State* v. *Brown,*

---

[5] There is a well established correlation between drug dealing and firearms. *United States* v. *Simon,* 767 F.2d 524, 527 (8th Cir. 1985); *United States* v. *Milham,* 590 F.2d 717, 721 (8th Cir. 1979).

[6] The trial court did not allow into evidence testimony concerning two other acts of misconduct by the defendant involving alleged drug dealing that took place subsequent to March 30, 1988, the day of the shooting, while the defendant was out on bond on this charge of murder.

supra, 56. " '[E]very reasonable presumption should be given in favor of the trial court's ruling.' " *State* v. *Shindell,* supra, 136; *State* v. *Ryan,* 182 Conn. 335, 337, 438 A.2d 107 (1980). " '[T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done.' " *State* v. *Braman,* supra, 676. " 'The problem is . . . one of balancing the actual relevancy of the "other crimes" evidence in light of the issues and the other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence.' " Id., 677–78; *State* v. *Holliday,* 159 Conn. 169, 173, 268 A.2d 368 (1970).

Although some degree of prejudice inevitably accompanies the admission of evidence of a defendant's criminal record or prior misconduct; see *State* v. *Nardini,* 187 Conn. 513, 523, 447 A.2d 396 (1982); we believe that, in context, the trial court did not abuse its discretion when it determined that the probative value of the evidence of the defendant's prior misconduct outweighed its prejudicial effect and admitted testimony concerning it over the defendant's objection. At the trial, there was other evidence of the defendant's involvement with drugs and, indeed, evidence concerning drugs permeated the entire proceedings. It is difficult to believe that the evidence of the defendant's prior possession of marijuana, under the circumstances as they unfolded at trial, could have had a tendency to shock or influence the jury or to color the proceedings so as to deprive the defendant of a fair trial. See *State* v. *Artieri,* 206 Conn. 81, 88–89, 536 A.2d 567 (1988).

Moreover, a single prior incident of misconduct is clearly less prejudicial to a defendant than multiple incidents or convictions. *State* v. *Crumpton,* supra, 230. The potential for prejudice is also reduced when the prior misconduct is dissimilar to the crime charged.

*State* v. *Santiago,* supra, 340. Further, any prejudicial effect of the prior misconduct evidence was minimized by the trial court's instructions to the jury limiting the purposes for which the evidence could be considered. *State* v. *Brown,* supra, 58; *State* v. *Shindell,* supra, 137–38; *State* v. *Howard,* supra, 684. Accordingly, we reject the defendant's claim that the trial court abused its discretion in admitting testimony concerning his prior misconduct.

## II

The defendant next claims that during the cross-examination of Harriet Thompson, a defense witness, the trial court improperly permitted the state, over his objection, to go beyond the scope of the direct examination. He claims consequently that "extraneous" evidence was injected into the trial concerning prior acts of misconduct not only of the defendant but also of Hubert Thompson, also known as "Pinochle," the witness' brother. The defendant maintains that the trial court's incorrect ruling deprived him of his state and federal constitutional rights to a fair trial.[7] We disagree.

At trial, Thompson testified on direct examination that she was the defendant's girlfriend, that she had been with him at her home the night before the shooting and that she had sent him out for breakfast the morning of the shooting. She also testified that Pinochle is her brother and consequently that she knows him well even though she sees him only about once a month. She further testified that she had never seen her brother or the defendant with a gun.

---

[7] The defendant made no constitutional claim at trial concerning Harriet Thompson's cross-examination, and does not, in his brief, seek review under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). We consequently will review his claim as one of an incorrect evidentiary ruling by the trial court, which is its proper classification in any event.

On cross-examination, however, Thompson admitted that she did not know what her brother's occupation was or whether he sold drugs for a living.[8] She also testified in response to cross-examination that she was unaware that her brother had been arrested for possession of narcotics in 1990 and had been found in possession of .22 caliber ammunition in 1987. Further, she admitted on cross-examination that she was not aware that her brother had been convicted as a result of an incident involving an armed robbery in 1984 and had been sentenced to prison.[9]

---

[8] The following colloquy occurred:

"[The State:] And would you say that you knew your brother pretty well?

"[Harriet Thompson:] Yes, I did.

"Q. At that time?

"A. Yes.

"Q. Okay. And what occupation did he have?

"A. Excuse me? I don't understand.

"Q. What kind of job did he do?

"A. I wouldn't know.

"Q. You didn't know what kind of—

"A. No, I didn't.

"Q. —job he had?

"A. No.

"Q. Did he have a job?

"A. I don't know.

"Q. And would you agree that at the time he was making a living selling drugs?

"A. I don't know."

[9] Harriet Thompson further testified:

"[The State:] Would it be correct to say you were unaware that your brother participated in a robbery in April of 1984 of a car of people who had lost their way in Charter Oak Terrace and that he held a silver colored handgun to the head of a woman who was an occupant of that vehicle? You didn't know that?

"[Harriet Thompson:] I didn't know anything about it.

"Q. You didn't know anything about that?

"A. No, I didn't.

"Q. You didn't know that your brother pleaded guilty to that crime and received a six year prison term suspended after four years?

"A. No.

"Q. Did you know your brother went to prison?

"A. No, I didn't.

When the state attempted to question Thompson concerning the nature and extent of her knowledge of the defendant, the defendant objected and the jury was excused. Outside the presence of the jury, the defendant argued that the testimony would be irrelevant, prejudicial and beyond the scope of the direct examination. The state conceded that its inquiries would, in fact, touch on past misconduct by the defendant but were proper to cast doubt on Thompson's credibility. The court then allowed the state to make inquiry of Thompson before the jury concerning the extent of her knowledge of the defendant.

Thereafter, Thompson, who maintained that the defendant was her boyfriend and that she had known him well for more than two years prior to the shooting, answered, in response to the state's cross-examination, that she did not know whether the defendant had a job in March, 1988.[10] She also responded that she was unaware that the defendant had been arrested two months prior to the date of the shooting for possession of marijuana.

"Q. You didn't know that?
"A. Nope.
"Q. And is it then your testimony that as far as you know your brother Pinochle, Hubert Thompson, never went to prison as a result of an incident and arrest that occurred in 1984?
"A. Yep.
"Q. All right. But you knew your brother pretty well?
"A. Yes, I did."
[10] The following colloquy occurred:
"[The State:] Miss Thompson, I think before we left you testified that—is it correct to say you know the defendant well?
"[Harriet Thompson:] Yes.
"Q. I beg your pardon?
"A. Yes.
"Q. Yes. And do you know if he had a job in March of 1988?
"A. No, I don't.
"Q. You don't know whether he had one?
"A. No, I don't know whether he had one or not.
"Q. Is it possible that he did?
"A. I don't know."

" 'It is well settled that our rule restricts cross-examination to matters covered in the direct examination, except as they involve credibility alone.' " *State* v. *Ireland,* 218 Conn. 447, 452, 590 A.2d 106 (1991), quoting *State* v. *Sharpe,* 195 Conn. 651, 657, 491 A.2d 345 (1985); *State* v. *Zdanis,* 173 Conn. 189, 195, 377 A.2d 275 (1977). The trial court is, however, granted broad discretion in determining the scope of cross-examination. *State* v. *Hernandez,* 224 Conn. 196, 208, 618 A.2d 494 (1992); *State* v. *Jackson,* 198 Conn. 314, 319, 502 A.2d 865 (1986); *State* v. *Sharpe,* supra.

The record indicates that the state's cross-examination did not impermissibly exceed the scope of Thompson's direct examination. The subject of the witness' relationships with the defendant and with her brother was raised on direct examination. The state simply explored those same areas in more depth on cross-examination to ascertain the basis and extent of Thompson's knowledge of the two men, to permit the jury to gauge the accuracy of her testimony. *State* v. *Williamson,* 206 Conn. 685, 699, 539 A.2d 561 (1988). "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject." *State* v. *Graham,* 200 Conn. 9, 13, 509 A.2d 493 (1986); *State* v. *Hernandez,* supra, 206.

Because Thompson had testified on direct examination that she had never seen her brother with a gun, it was proper to allow the state to question her on cross-examination as to whether she was aware that her brother had been arrested while in possession of ammunition and for armed robbery. "The party who initiates discussion on the issue is said to have 'opened the door' to rebuttal by the opposing party." *State* v. *Graham,* supra. Moreover, Thompson had depicted herself as someone who knew the defendant and Pinochle well. Thompson, however, admitted on cross-examination

that she did not know what either of them did for a living or that either of them had been arrested. Those gaps in her knowledge could reasonably have been expected to give the jury pause concerning the reliability of her testimony on direct examination. If a question is designed to " 'rebut, impeach, modify, or explain' " direct testimony, it is within the scope of the direct examination. *State* v. *Sharpe,* supra, 657; *State* v. *Zdanis,* supra, 196. The state's inquiries on cross-examination, designed to impeach Thompson's direct testimony by questioning the extent of her knowledge of the subjects to which she had testified, were proper questions on cross-examination and the trial court did not abuse its broad discretion by allowing them.

## III

The defendant next claims that the trial court improperly permitted the state to impeach Raymond Vail, a defense witness, with a 1964 conviction for breaking and entering with criminal intent. He contends that the prejudicial effect of Vail's prior conviction outweighed any possible probative value on the issue of his credibility because of its remoteness in time. The defendant also claims that the trial court improperly allowed evidence of Vail's prior conviction because the court failed to exercise its discretion, as required by *State* v. *Nardini,* supra, 523, to determine its admissibility. He argues that Vail's testimony, if unimpeached, might have raised a reasonable doubt of his guilt and resulted in his acquittal. He claims that consequently he is entitled to a new trial.

The trial court, outside the jury's presence, heard arguments relating to the remoteness of Vail's 1964 conviction and concluded that evidence of the conviction was admissible on the issue of Vail's credibility. Vail was thereafter questioned briefly on cross-exami-

nation concerning his 1964 conviction.[11] Subsequently, to rehabilitate Vail, he was queried on redirect examination by the defendant concerning his age at the time of the incident.[12]

The defendant first argues that the trial court failed to weigh the probative value of Vail's 1964 conviction against its prejudicial effect as required by *State* v. *Nardini,* supra, before admitting the conviction into evidence. He claims that the court simply decided that the remoteness of the conviction went to its weight and not to its admissibility and routinely allowed the evidence, as the trial court had done in *State* v. *Robing-*

---

[11] Vail testified on cross-examination as follows:

"[The State:] You were not convicted of breaking and entering in 1964 as a result of an incident that you were arrested on?

"[Raymond Vail:] Yes, I was. I was convicted. I was put on probation.

"Q. All right. You were convicted of breaking and entering in 1964?

"A. Right.

"Q. And you pled guilty?

"A. I pled guilty because, like I say—

"Q. Just answer the question if you could sir. Did you plead guilty?

"A. I didn't commit the crime. I pleaded guilty.

"Q. I would like to know, did you plead guilty?

"A. Yes.

"Q. Okay. And it involved you entering a laundromat.

"A. Right.

"Q. Is that correct?

"A. Yes.

"Q. And being found in possession of burglary tools?

"A. I didn't have no burglary tools on me, but it was a screwdriver and a wrench that was already there.

"Q. All right. And you were charged—that breaking and entering was based on you breaking in—the charge was that you broke in to steal the money from the laundromat?

"A. Right. No machines was touched.

"Q. Thank you, sir. Nothing further."

[12] Vail testified on redirect examination as follows:

"[Defense Counsel:] How old are you today? How old are you now?

"[Raymond Vail:] Forty-two.

"Q. Okay. And 1964 is twenty-six years ago.

"A. Right.

"Q. How old were you in 1964? My math is terrible.

"A. I think I was seventeen, eighteen."

*ton,* 137 Conn. 140, 145, 75 A.2d 394 (1950), a case decided before *Nardini* that required a balancing of prejudice and probative value. We disagree.

*Nardini* was the only case cited as pertinent during oral argument concerning this issue in the trial court. *Robington* was not mentioned and we have no reason to believe that the trial court utilized that test to arrive at its decision. "We do not presume error; the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden demonstrating the contrary." *State* v. *Crumpton,* supra, 231. The record makes it abundantly clear that the trial court was aware of its obligation under *Nardini* to "evaluate the prejudicial tendency of the conviction against the probative value. Absent a clear indication that the court did not apply this standard, we conclude that the trial court applied the correct legal standard." *State* v. *Crumpton,* supra, 232.

The defendant also claims that even if the court did exercise its discretion as required by *Nardini,* it did so improperly. We disagree. At common law, anyone who had been convicted of a felony, a misdemeanor involving dishonesty, or crimes relating to the obstruction of justice, was disqualified from testifying at a trial. *State* v. *Geyer,* 194 Conn. 1, 10, 480 A.2d 489 (1984). General Statutes § 52-145[13] now allows persons so convicted to testify but also permits the conviction of a crime to be shown for the purpose of affecting credibility. We have generally recognized three primary fac-

[13] "[General Statutes] Sec. 52-145. CERTAIN WITNESSES NOT DISQUALIFIED. CREDIBILITY. (a) A person shall not be disqualified as a witness in any action because of, (1) his interest in the outcome of the action as a party or otherwise, (2) his disbelief in the existence of a supreme being, or (3) his conviction of crime.

"(b) A person's interest in the outcome of the action or his conviction of crime may be shown for the purpose of affecting his credibility."

tors to be considered in determining when a criminal conviction may be admitted to affect credibility: "(1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time." *State* v. *Nardini,* supra, 522; *State* v. *Pinnock,* 220 Conn. 765, 779–80, 601 A.2d 521 (1992); see also *Heating Acceptance Corporation* v. *Patterson,* 152 Conn. 467, 471–72, 208 A.2d 341 (1965).

In this instance, we conclude that the prejudice that resulted from the admission of the evidence of Vail's prior conviction was minimal. Although the trial court always has the responsibility to consider the potential prejudice stemming from the impeachment of any witness with evidence of conviction of a crime, the extent of prejudice to the defendant is considerably lessened when the witness impeached is not the defendant himself. *State* v. *Pinnock,* supra, 780–81. "[T]he danger of unfair prejudice is far greater when the accused, as opposed to other witnesses, testifies, because the jury may be prejudiced not merely on the question of credibility but also on the ultimate question of guilt or innocence." (Internal quotation marks omitted.) Id. Also, the court's instructions to the jury lessened any prejudicial effect of the evidence by reminding the jury that it was not required to disbelieve a witness because of a prior conviction. Furthermore, the remoteness in time of Vail's conviction was emphasized by the defendant on redirect examination and in closing arguments, diminishing its importance.

The second factor to be considered is the requirement that the prior crime used for impeachment purposes must have significant relevance to the truthfulness of the witness. We have consistently "recognized that crimes involving larcenous intent imply a general disposition toward dishonesty or a tendency to make false statements." *State* v. *Crumpton,* supra, 229; *State* v.

*Geyer,* supra, 12. "[B]reaking and entering with criminal intent [is] a crime . . . associated with larceny and, therefore, implying dishonesty in the general sense" directly affecting the credibility of the witness. *State* v. *Nardini,* supra, 526; *State* v. *Crumpton,* supra.

Finally, we note that the trial court, in its ruminations on the admissibility of Vail's conviction, remarked, and we agree, that the conviction was "quite remote" and that it stretched the limits of admissibility. Remoteness, however, is only one of the factors to be considered. In *Nardini,* we recognized that "convictions having some special significance upon the issue of veracity surmount the standard bar of ten years and qualify for the balancing of probative value against prejudice." *State* v. *Nardini,* supra, 526 (twenty year old conviction for breaking and entering with criminal intent properly admitted). We cannot say that the trial court, in this instance, after reflecting on the issue of probative value versus prejudice, abused its discretion when it decided to admit Vail's conviction for impeachment purposes despite its age.

Furthermore, we disagree with the defendant's argument that Vail's testimony was crucial and that the outcome of his trial would have been different had Vail's testimony not been impeached by his conviction. Vail's testimony served only to corroborate the defendant's statement that he had been attacked and knocked to the ground. Another witness also testified that he had seen the defendant on the ground being beaten during the altercation.[14] Moreover, Vail did not see the shooting and consequently could not testify that the victim had been shot accidentally as the defendant contended. His testimony, therefore, would not have refuted that of the three eyewitnesses for the state who

[14] The witness, Eddie Bowman, testified that he saw the defendant involved in a fight with Jones, Barnes and Sanders and that Sanders had been hitting the defendant who was on the ground.

testified that they saw the shooting and that it was deliberate. The admission of Vail's conviction to impeach his testimony, therefore, even if incorrect, was harmless. This claim of the defendant is meritless.

## IV

The defendant next claims that his constitutional rights to due process and against compelled self-incrimination were violated by the state's reference in its final argument to his refusal to give a written statement at Hartford police headquarters following his arrest. He contends that the state, in so arguing, violated the doctrine expressed in *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), which proscribes the use of a defendant's silence to create an unfavorable inference of guilt. Because this claim was not preserved at trial, the defendant seeks to prevail under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989).

As previously noted, Officer Nicholas Russo testified that he and another officer had interviewed the defendant at Hartford police headquarters following his arrest. Russo stated that at that time the defendant had been anxious to talk and had attempted to relate his version of the incident before Russo had an opportunity to inform him of his rights.[15] When Russo read the defendant his *Miranda* rights, Russo emphasized to the defendant that he had a right to remain silent and that he had a right to have an attorney present

---

[15] Russo testified: "We went into the room. We introduced ourselves as detectives so he knew—because [we] were in plain clothes—so he knew who he was talking to. Mr. Cooper started to talk to us, at which time we told him to stop, that we had to go through some procedures first before we talked to him. I always carry—it is a blue card. And it has your constitutional rights on it. I took the card from my wallet. I read the rights to Mr. Cooper. And Mr. Cooper was asked by myself if he understood what I was reading to him, that he didn't talk—he didn't have to talk to the police at this time."

during questioning. The defendant responded that he understood his rights but that he wished to give his account of what had occurred.

The defendant stated to Russo that he had been attacked by a group of seven to nine black males and beaten to the ground. While on the ground, he noticed a gun and grabbed it. As he began to get up, the gun accidentally discharged, and the bullet struck one of his attackers.[16] He also said that, thereafter, as he was running away, the gun had discharged again and that he had thrown it between two houses as he ran toward the river.[17] The defendant, however, refused to give a written statement or to sign any statement without an attorney being present. Russo thereupon terminated the interview.[18]

During final argument, the state referred to the defendant's refusal to give a written statement when interviewed by Russo. The state remarked, "Why not? If it's the truth, put it in writing." The defendant did not object immediately but waited until the state had completed its argument and the jury had been excused. He then objected, arguing that the state had misused the exercise of his *Miranda* rights in order to create an inference of guilt. He asked the court to strike all the state's remarks concerning his refusal to give or sign a written statement.

---

[16] During direct testimony, Russo was asked whether the defendant used the word "accident." "To my recollection he never said 'accident.' Those were the two . . . ['the two things he kept conveying over and over again. That it wasn't his fault and he didn't mean to do it'], the two ways he described it."

[17] The gun was actually retrieved the following day in the river near the spot where the defendant had been apprehended.

[18] Russo testified: "I asked Mr. Cooper would he be willing to give a written statement or put what he had told me into writing, at which time Mr. Cooper said no, he didn't; he didn't wish to give a written statement, that he wasn't going to sign anything without a lawyer present."

In response, the state, "in order to avoid problems on appeal," offered to withdraw its remarks to the jury, despite its expressed opinion that the defendant had effectively waived all his *Miranda* rights. The court then recalled the jury and the state informed the jury that it was withdrawing its remarks concerning the defendant's refusal to give a written statement.[19] The state told the jury not to "consider [its remarks] in any way as evidence of the defendant's guilt." The defendant agreed to this procedure and did not request any further remedy. During his final argument, moreover, the defendant reminded the jury of the withdrawal by the state of the questioned portion of its argument. The trial court thereafter, during its charge to the jury, gave a specific curative instruction, enjoining the jurors from considering the state's remarks regarding the defendant's refusal to give a written statement.[20] The defend-

[19] The assistant state's attorney stated: "Ladies and gentlemen, I want to address you to withdraw an argument that I did make. And that was you recall when the defendant first gave his statement to the police orally he was asked if he would commit it to writing and he said that he would not. He also requested a lawyer at that time. And I argued would an innocent man do that. I will withdraw that argument. The reason being that the defendant asked for a lawyer. And it may well be that that's the only reason why he didn't commit the statement to writing. And because we want to approach this case as fairly as possible from every avenue, it's the state's view that you ought not to consider that in any way as evidence of the defendant's guilt."

[20] The court stated: "I inform you that that was the defendant's basic fundamental constitutional right, the right to confer with an attorney on any matter, particularly an important matter such as giving a written statement to be signed. That was his right. And it is indeed an important, precious, fundamental right enjoyed by all citizens . . . . Certainly no inference unfavorable to the accused Robert Cooper is to be drawn from the exercise of that basic right. No inference negative or adverse or unfavorable to Mr. Cooper is to be drawn by you, as the jury, from the evidence that Mr. Cooper stated he would not give a written statement or sign such statement without the opportunity to confer with his attorney. Simply put, that was his basic fundamental right. The fact that he exercised it cannot in any way be used or held against him. That he exercised that basic fundamental right is not to be considered by you as any indication of guilt whatsoever."

ant did not object to the procedures employed to ameliorate any possible improper inference that the jury might have drawn from the state's remarks.

Pursuant to *State* v. *Golding,* supra, 239–40, a defendant may prevail on an unpreserved claim of constitutional error only by meeting all of the following conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Marra,* 222 Conn. 506, 527, 610 A.2d 1113 (1992). In harmony with the objective of *Golding,* the defendant's claim may be disposed of "by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding,* supra, 240; *State* v. *Pinnock,* supra, 778.

The defendant argues that he was deprived of a fair trial by the state's violation of the rule established by the United States Supreme Court in *Doyle,* prohibiting the use of a defendant's silence after the advisement of *Miranda* rights to imply guilt or to indicate a consciousness of guilt. *Doyle* v. *Ohio,* supra, 618. He contends that he had invoked the fifth amendment by refusing to give a written statement without an attorney and that such decision on his part could not be used against him at trial. He claims that, although the state withdrew its reference to his refusal to give a written statement and the court delivered a curative instruction, the harm caused by the state's argument was not vitiated.

The state argues that no constitutional violation exists because when the defendant objected to the

state's remarks, the jury was recalled and the state withdrew that portion of the closing argument to which the defendant had objected. Moreover, the defendant in his closing argument reminded the jury that the state's remarks concerning the defendant's refusal to give a written statement had been withdrawn and were not to be considered. In addition, the trial court gave a curative instruction in which it ordered the jury to disregard the state's argument. "[J]urors are presumed to follow the instructions given by the judge." *State v. Williams,* 202 Conn. 349, 363–64, 521 A.2d 150 (1987); *State v. Barber,* 173 Conn. 153, 156, 376 A.2d 1108 (1977). Further, after his initial objection, the defendant voiced no further challenge to the state's argument or manifested any disapproval of the steps taken to cure any possible harm occasioned by it.

Assuming that the disputed argument when made constituted a *Doyle* violation, the argument was withdrawn by the state and subsequently charged out of the case by the trial court apparently with the approbation of the defendant. Under such circumstances, it can hardly be said that a constitutional violation clearly existed and clearly deprived the defendant of a fair trial. The defendant, pursuant to the third prong of *Golding,* cannot prevail on this claim.

The defendant also claims that the state's remarks constituted such egregious prosecutorial misconduct that the trial court should have declared a mistrial sua sponte. This claim is without merit. "The trial court has great latitude in ruling on motions for mistrial. *State v. Nowakowski,* 188 Conn. 620, 624, 452 A.2d 938 (1982); *State v. Perez,* 181 Conn. 299, 310, 435 A.2d 334 (1980)." *Holbrook v. Casazza,* 204 Conn. 336, 355, 528 A.2d 774 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988). "The general rule is that a mistrial is granted only where it is apparent to the court that, as a result of some occurrence dur-

ing trial, a party has been deprived of the opportunity for a fair trial. *State* v. *Gaston,* 198 Conn. 490, 495, 503 A.2d 1157 (1986); *State* v. *DeMatteo,* 186 Conn. 696, 703, 443 A.2d 915 (1982)." Id., 356.

In this case, we cannot say that it should have been apparent to the trial court that the state's remarks, tempered as they were by the state's withdrawal of those remarks and the trial court's curative instruction, to neither of which the defendant objected, deprived the defendant of the opportunity for a fair trial. It certainly was not apparent to the defendant, who did not make a motion for a mistrial. The court did not abuse its broad discretion by not declaring a mistrial sua sponte. *State* v. *Smith,* 200 Conn. 544, 548, 512 A.2d 884 (1986); *State* v. *Fleming,* 198 Conn. 255, 264, 502 A.2d 866 (1986).

V

The defendant's final claim is that a supplemental instruction delivered by the trial court unconstitutionally allowed the jury to presume the existence of a specific intent to kill on the part of the defendant, thus violating the edict of *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). The supplemental instruction was given when the court was requested by the jury to redefine and reexplain "intent." In its supplemental instruction, the court, in order to highlight the difference between intent and premeditation, gave the example of a novice skier skiing down a mountain and suddenly being confronted with the choice of traversing a dangerous slope or taking an easier trail. The court explained that the skier, without the time or opportunity for premeditation as to his course of action, could instantaneously form an intent to take a particular trail.

The defendant argues that the court's instruction was incorrect and unconstitutional because it blurred the

distinction between mens rea and actus reus, detracted from the reasonable doubt standard and shifted the burden of proof to the defendant to demonstrate the lack of a specific intent to kill. Because this claim was not preserved at trial, the defendant seeks to prevail under *State* v. *Golding,* supra, 239–40.

" 'In *Sandstrom* v. *Montana,* supra, 517–24, the United States Supreme Court held that a jury instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts" violated the defendant's due process rights because a reasonable jury could have interpreted the instruction as a conclusive or burden-shifting presumption and thus relieved the state of its burden of proving every element of the crime. See *Francis* v. *Franklin,* 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985); *United States* v. *United States Gypsum Co.,* 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978); *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) . . . . We have, however, recognized that the rule of *Sandstrom* must not be oversimplified. *State* v. *Mason,* 186 Conn. 574, 582–83, 442 A.2d 1335 (1982); *State* v. *Pina,* 186 Conn. 261, 263, 440 A.2d 967 (1982). *Sandstrom* does not invalidate, for example, the use of an "entirely permissive inference or presumption, which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and that places no burden of any kind on the defendant." *Ulster County Court* v. *Allen,* 442 U.S. 140, 157, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979); see *State* v. *Fernandez,* 198 Conn. 1, 20, 501 A.2d 1195 (1985); *State* v. *Arroyo,* 180 Conn. 171, 175, 429 A.2d 457 (1980). "A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." ' *State* v. *Amarillo,* 198 Conn. 285, 300–302, 503 A.2d 146 (1986); see also *State* v.

*Shine,* 193 Conn. 632, 644–45, 479 A.2d 218 (1984); *State* v. *Johnson,* 185 Conn. 163, 167–69, 440 A.2d 858, aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Vasquez,* 182 Conn. 242, 246–48, 438 A.2d 424 (1980)." *State* v. *Palmer,* 206 Conn. 40, 47–48, 536 A.2d 936 (1988).

Although the giving of examples sometimes causes problems; *United States* v. *Pinkney,* 551 F.2d 1241, 1244 (D.C. Cir. 1976); *State* v. *DelVecchio,* 191 Conn. 412, 417–22, 464 A.2d 813 (1983); we fail to see how the example given by the trial court resulted in any of the possible dire consequences attributed to it by the defendant. The example given, in the context of the jury instructions as a whole, simply distinguished "intent" from "premeditation" and illustrated for the jury that, although the defendant's intent to kill had to be proven by the state beyond a reasonable doubt, that intent could be formed instantaneously and did not require any specific period of time for thought or "premeditation" for its formation.

In the context of the entire charge, the jury could not have misunderstood the court's supplemental instruction to do anything other than distinguish "intent" from "premeditation." Throughout its instructions the court repeatedly stressed the state's obligation to prove the defendant's intent to kill beyond a reasonable doubt in order to obtain a murder conviction. It is inconceivable that the "skier" example given by the trial court somehow diluted that obligation that the court had so stressed. "It is well established that individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge." *State* v. *Palmer,* supra, 46; *Cupp* v. *Naughten,* 414 U.S. 141, 146–47, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); *State* v. *Crafts,* 226 Conn. 237, 249, 627 A.2d 877 (1993); *State* v. *Silano,* 204 Conn. 769, 773, 529 A.2d 1283 (1987).

We conclude that the example given by the trial court to explain to the jury the distinction between "intent" and "premeditation" did not permit the jury to entertain a conclusive presumption concerning the defendant's intent to kill from the consequences of his actions. Nor did it "blur the distinction" between mens rea and actus reus as claimed by the defendant. The defendant consequently has failed to demonstrate that the example given by the court constituted a clear constitutional violation. He therefore cannot prevail on his unpreserved claim of error under the third prong of *Golding*.

The judgment is affirmed.

In this opinion PETERS, C. J., BORDEN and NORCOTT, Js., concurred.

BERDON, J., dissenting. I am troubled by this case. At the very least, I would reverse on the basis of the introduction of the *twenty-six year old conviction* of breaking and entering, which was used to impeach the credibility of Raymond Vail, an important defense witness. Vail was convicted of breaking and entering when he was *seventeen years old*.

"Three factors should be examined to determine whether a prior criminal conviction properly has been admitted: (1) the extent to which admission is likely to prejudice the defendant's cause; (2) the significance of the prior crime as bearing on . . . truthfulness; and (3) the remoteness in time of the prior conviction." *State* v. *Geyer*, 194 Conn. 1, 11, 480 A.2d 489 (1984); see also *State* v. *Nardini*, 187 Conn. 513, 522, 447 A.2d 396 (1982).

In the present case, it is quite evident that the trial court failed to make this analysis. The trial court obviously relied on the rule, long discarded, that remoteness goes "to [the] weight, not [the] admissibility" of

the evidence. *State* v. *Robington,* 137 Conn. 140, 145, 75 A.2d 394 (1950). The trial court stated: "It is quite, remote; there is no question about that. But, of course, that's something that can be considered in reference to any weight, if any, that would be given to that conviction on the question of impeachment. Objection overruled. Exception may be noted."

The majority would have us believe that the prejudice to the defendant was minimal. Vail, however, was one of only two witnesses who corroborated the defendant's claim that he had been attacked by a group of young men, including the victim. Vail's testimony was essential because it directly undermined the credibility of the state's three principal witnesses.

Just this term, we upheld the trial court's refusal to admit into evidence the following criminal convictions for the purpose of impeaching the credibility of the *state's* key witness: "four counts of breaking and entering in 1957; two counts of breaking and entering and two counts of larceny in 1958; one count of breaking and entering theft in 1959 . . . ." *State* v. *Sauris,* 227 Conn. 389, 408, 631 A.2d 238 (1993). In *Sauris,* we said: "While leaving the matter to the general discretion of the trial court, we have sanctioned a general guideline for the determination of remoteness that parallels rule 609 (b) of the Federal Rules of Evidence. Rule 609 (b) establishes a ten year limitation from conviction or release from resulting confinement upon the use of the conviction for impeachment purposes unless the probative value of the conviction substantially outweighs its prejudicial effect. *State* v. *Nardini,* supra, 525–26. Although we recognize that convictions having special significance on the issue of veracity may surmount the standard ten year bar; id., 526; we conclude that, in this case, it was within the trial court's discretion to conclude that three convictions over thirty years

old, even though bearing on the witness' veracity, were too remote to be admissible." Id., 409–10.

I believe the time has come to adopt rule 609 (b) of the Federal Rules of Evidence, which places a presumptive time limitation on the age of the conviction, as follows: "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction . . . unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." Federal Rules of Evidence 609 (b).

Accordingly, I would find either that the trial court failed to exercise its discretion or alternatively, that it abused its discretion in allowing the conviction into evidence to impeach the credibility of Vail.

I am also concerned about part I of the majority opinion, which upholds the admission into evidence of the defendant's possession of marijuana two months prior to the incident in this case. The majority acknowledges that this is a close call. I do not believe that the defendant's possession of marihuana two months prior to the date of the shooting is relevant to establish a motive for the shooting or to establish that he was carrying a weapon. Even if the evidence were relevant, its prejudicial impact far outweighs any probative value. *State v. McDermott,* 190 Conn. 20, 25, 458 A.2d 689 (1983); see also C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.3.2, p. 233.

This was not an open and shut case. The jury deliberated over the course of *seven days* and obviously was concerned about intent because it asked to be reinstructed on this element. In view of the difficult issues in this case, the attack on Vail's credibility and the evidence of the defendant's misconduct were especially prejudicial. I would reverse.

Accordingly, I dissent.